ZENOU, Plaintiff in error, vs. THE STATE, Defendant in error.

*June 4—June 26, 1958.*

658

660

For the plaintiff in error there was a brief and oral argument by *John J. Byrnes* of Elkhorn.

For the defendant in error there was a brief by the *Attorney General* and *William A. Platz,* assistant attorney general, and *Erwin C. Zastrow,* district attorney of Walworth county, and oral argument by *Mr. Platz* and *Mr. Zastrow.*

FAIRCHILD, J. The principal contention of the defendant is that the circuit court erred in refusing defendant's request for appropriate instructions and submission of forms of verdict on second-degree murder and manslaughter. In addition the defendant challenges acts of the court in excluding certain evidence, refusing requested instructions, and deleting certain facts from a hypothetical question. The defendant also claims that the interest of justice requires a new trial.

1. *Submission of manslaughter.* Manslaughter is now defined in part as causing the death of another human being "without intent to kill and while in the heat of passion; . . ." Sec. 940.05 (1), Stats. That which will constitute "the heat of passion" which will reduce what would otherwise be murder to manslaughter "is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing

cause rather than from any real wickedness of heart or cruelty or recklessness of disposition." *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N. W. (2d) 721. It has been said that " 'the provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror.' " 21 Am. & Eng. Ency. of Law (2d ed.), p. 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N. W. 55. Giving defendant the benefit of every doubt, we may assume that on and after January 1st he had reasonable grounds to believe that his wife had been unfaithful, that, in taking the furniture and selling the truck, she was violating their agreement as to the division of property as he understood it, that he was frustrated by his inability to obtain an immediate solution of his difficulties from the authorities or through an attorney, that he resented Dorothy's unwillingness to discuss these matters with him on Monday afternoon, and that he felt he had been deprived of his right to see his children. None of these circumstances, either alone or in combination, meets the test of adequate provocation. His discovery of her interest in another man had become a remote circumstance by January 21st. None of the difficulties over the property should be expected to produce in the minds of persons ordinarily constituted the degree of passion referred to above. Just prior to the killing, he was visiting his children. Aside from the inadequacy of the provocation, there is the question of whether the evidence permitted a reasonable doubt of his intent to kill, hereinafter discussed. The court was clearly not required to submit to the jury a form of verdict and instructions on manslaughter.

2. *Submission of second-degree murder.* First-degree murder is now defined as causing "the death of another human being with intent to kill that person or another." Sec. 940.01, Stats. Second-degree murder is defined as causing "the

death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life." Sec. 940.02. If the actions and mental state of a defendant are found to be such as to make him guilty of first-degree murder with the sole exception that he does not have "the mental purpose to take the life of another human being," he is guilty of second-degree murder. The "depravity" referred to in the definition of second-degree murder is present as well in first-degree murder, the difference being the absence of the design to effect death. *Montgomery v. State* (1922), 178 Wis. 461, 466, 190 N. W. 105.

The test to be applied in determining whether lesser degrees of the offense charged are to be submitted on request is whether there is some reasonable ground in the evidence, in the judgment of the court, for a conviction of the lesser offense. *State v. Stortecky, supra.*

Putting it in another way, if the evidence, in one reasonable view, would suffice to prove guilt of the higher degree beyond a reasonable doubt, and if, under a different, but reasonable view, the evidence would suffice to prove guilt of the lower degree beyond a reasonable doubt, but leave a reasonable doubt as to some element included in the higher degree but not in the lower, the court should, if requested, submit the lower degree as well as the higher. The state's interest in justice is served by submission of both in such a case. Both the state and the defendant have a right to have the lower degree submitted so that the jury will not be subjected to the choice of either acquitting or convicting of the higher degree where it is really convinced of only the lower degree. Ordinarily, if a court is in doubt, it should submit both degrees upon request.

The evidence summarized in the statement of facts amply sustains the verdict of guilty of murder in the first degree. There is no dispute as to defendant's acts. There is overwhelming evidence of mental purpose to kill his wife. He

bases his contention that second-degree murder should have been submitted upon his testimony describing his own state of mind. The real question is whether that testimony could result in a reasonable doubt of his mental purpose to kill. We assume that in refusing to submit second-degree murder the circuit court decided that it could not. We agree.

Other than Henri's testimony of what was in his mind, and possibly Mr. Williamson's estimate of Henri's emotional state four or six hours before, there was no evidence tending to show that Henri did not know what he was doing and intend the natural consequences. Several wounds, including the fatal one, could not have been inflicted by a mentally responsible person except with intent to kill. There was unchallenged testimony that Henri had made several statements about killing his wife. Immediately after the stabbing he said he had killed her.

Giving Henri's testimony the most favorable interpretation, it was to the effect that he bought the knife to scare his wife, that he struck the first blow or two in order to scare her, that thereafter he lapsed into a dreamlike state and that the blows he then struck were essentially involuntary. Assuming that such testimony as to one's state of mind, standing alone, could be believed and result in conviction of second-degree murder and not first, that is not what is before us in this record.

Here it is an undisputed fact that shortly after the killing Henri told the sheriff that he had bought the knife for the purpose of killing his wife if they did not reach a settlement. He signed, understandingly, a written statement, summarizing oral statements, that "I wanted to kill her." The circuit court could properly determine that Henri's testimony contradicting, but failing to deny or explain the earlier statements, was so incredible that under no reasonable view of the evidence could there be a reasonable doubt of his intent to kill.

Although a judge has no power to direct a jury to convict, and in that sense has no power to determine whether under the evidence there is no reasonable doubt of guilt, it does not follow that in deciding whether to submit a verdict for a lower degree of offense he cannot determine whether the evidence permits a reasonable doubt of some element necessary to convict of the higher degree.

In a case involving somewhat similar facts, a defendant was found guilty of murder in the first degree. He had gotten into an argument with his wife and testified that she had called him bad names and that after this " 'everything got black in front of [his] eyes and [he] took the knife' " and killed her. There the trial court had submitted a form of murder in the second degree but the defendant was complaining because of refusal to submit a form of verdict of manslaughter in the third degree. *State v. Genova* (1943), 242 Wis. 555, 8 N. W. (2d) 260. The court said at page 558, "under the evidence there was a premeditated design to kill, making the crime murder in the first degree unless the accused was insane at the time. There was no occasion, as matters developed, for giving the jury, even if it were so inclined, an opportunity to indulge in sympathetic compromise and fix the guilt as murder in the second degree or manslaughter in the third degree, . . ."

3. *The court's refusal to receive certain exhibits offered by defendant.* Exhibits 2, 3, 4, and 5 were photographs which corroborated certain of Henri's testimony which related to the circumstances in the background and was never disputed. He had testified that he had slept on a mattress on the floor at the cottage on the night of January 18th. Exhibit 2 was a picture taken in the cottage and showing that bed. He had testified to his labors in making certain substantial improvements of the property. Exhibits 3, 4, and 5 were pictures of

him in and about a ditch which he had dug and in which he had laid sewer pipes. These exhibits related to matters substantially remote in time from the killing and Henri's testimony about them was undisputed. Whether to admit them or not was a matter in the court's discretion. Exhibit 9 was a postcard mailed from Henri in Florida to Dorothy at Delavan. It would not have been error to receive this postcard upon the same basis as the greeting cards and telegram from her dating from approximately the same time. All these items simply tended to corroborate Henri's testimony that they were then on good terms. The sending of this postcard was remote in time and added little, if anything, to the testimony and other evidence which were admitted. It was within the discretion of the court.

4. *Refusal of instructions.* Defendant requested an instruction that the presumption of the defendant's sanity shall prevail "unless and until such time as the evidence creates in the minds of the jury a reasonable doubt of his sanity or mental responsibility at said time." The court gave the instruction as requested except that it omitted the following: "This reasonable doubt may arise as well from evidence introduced by the state, or by the circumstances of the act charged, as from the evidence of the defense." The omitted language is taken from the opinion in *Duthey v. State* (1907), 131 Wis. 178, 189, 111 N. W. 222. It is followed in that opinion by: "and the proper instruction on that subject is simply that if, after considering all the evidence before them, there remains in the minds of the jury any reasonable doubt of sanity, their duty is to find the accused insane." In several portions of the instructions the court did tell the jury that it was to consider "all the evidence in the case" upon the issue of insanity. It is considered that there could be no prejudicial error in failing to include the language requested by the defendant.

Defendant requested another instruction, no part of which was given. It is conceded upon appeal that the last sentence of the instruction is not applicable to occasional or intermittent insanity such as would be the claim of defendant in this case. A trial court may properly refuse to give an instruction where a portion of it is improper. Sec. 270.21, Stats. The substance of the first portion of the requested instruction was in our view adequately covered in different language in the instructions given by the court.

5. *The hypothetical question.* Defendant called a psychiatrist as an expert witness. He was asked "assuming that a man thirty-four years of age on January 21, 1957, killed his wife with the use of a pocketknife and that he inflicted 18 or 19 blows to her body, and assuming that this man states on oath that at the time he did the killing everything went black, and assume further that he stated he felt that Satan came into his body, and assuming further that he stated at the time that he didn't see anything and that this period of laxness [blackness] lasted for half an hour, and assume further that he stated he thought he was in Algeria at the time, could you give us an opinion as to whether or not this man was sane or insane at the time he committed the killing?" Objection was made that some of the assumptions were not in evidence. The court ruled that the reference to Satan, the length of time of the period of blackness, and the reference to Algeria should all be left out of the question. The doctor replied that he had no opinion on those facts. He was then asked, "Why would you be unable to state an opinion?" and he answered, "Assuming that the man had blacked out I don't think it would be possible to state whether he was sane or insane." The transcript included in the bill of exceptions as settled by the court contains no reference to Satan although it does contain the answers quoted in the statement of facts with reference to being in Algeria and

the lapse of half an hour or forty-five minutes while Henri was in the Robison house.

After the verdict a motion was made for the correction of the record of this testimony and the defendant produced affidavits of newspaper reporters, his counsel and one other, to the effect that the reference to Satan was made as well as a statement that he saw "comets and scorpions in front of my eyes." The district attorney, his assistant, and the sheriff all made affidavits to the contrary and the court resolved the matter by denying the motion to correct the record.

There was evidently some difficulty in reporting the exact testimony of defendant because of his difficulty with the English language. The reporter included a notation in the transcript as follows:

"Due to language difficulties and speaking in broken English, plus the defendant's manner of speaking very fast with many gesticulations this witness was most difficult to report verbatim in parts of his testimony and in spots all that anyone could do was to obtain the gist of his testimony."

The court correctly eliminated the assumption as to the length of the period in which things were all black. The period which Henri testified lasted half an hour or forty-five minutes began when Henri reached the Robison house. The "blackness" came on him later. The court incorrectly stated that the reference to Algeria had been stricken, but it is apparent that whatever the correct testimony was about Algeria, there was more to it than simply that Henri thought he was in Algeria. The court declined to change the reporter's transcript with reference to Satan.

It does not appear that the court's error, if any, with respect to the elements of the hypothetical question was prejudicial. The doctor interpreted the "blackness" as "blackout," which appears to mean loss of memory. It is not clear to us that he could have given an opinion if the question

had been allowed to stand as framed; there was no offer of proof or other showing that the doctor would have been able to form an opinion if one or more of the deleted assumptions had remained in the question; the facts the doctor was asked to assume were not established except by testimony which was, as has been pointed out, contradicted by Henri's statements made shortly after the event.

6. *New trial in the interest of justice.* Defendant's counsel argues that defendant did not have a fair trial, citing several facts.

One was that two witnesses for the state testified that they did not like the defendant. This testimony was brought out by defense counsel on cross-examination.

When one of the state's witnesses was testifying, defendant "made a big commotion by talking and gesturing and even when ordered by the court to remain quiet he still continued causing a commotion." The court then said, "If the defendant refuses to remain quiet I shall have to order him gagged and I shall have to clear the courtroom." The defendant continued talking, the court sent the jury out, and then in chambers warned defendant that there could be "no crying out like you have just done in the courtroom" and explained that he would get his chance to testify later. The remark in the jury's presence about gagging defendant was unfortunate, but we can well assume that the provocation by defendant was great.

Defendant challenges, as leading, a question to which he objected at the trial. The testimony of an officer was:

"*Q.* Did he [defendant] make any other statements while you were driving over here? *A.* Not that I recall right now.

"*Q.* To refresh your memory, was any statement made relative to how long he had been thinking about this?

"Mr. Byrnes: I object as leading.

"Court: Objection overruled.

"*A*. That was after coming to Elkhorn he made the statement he would never do anything like that unless he took time to think about it. He said he had thought about it for two or three weeks, and now he was glad it was over with."

A question is not leading if it merely suggests a subject without suggesting an answer or a specific thing and even a leading question may be properly put to a witness after his memory on a particular subject is apparently exhausted if he has omitted a fact by reason of want of recollection. 5 Jones, Commentaries on Evidence (2d ed.), p. 4546, sec. 2325, and p. 4556, sec. 2329. No motion was made to strike the officer's answer as not responsive.

We are mindful of defendant's difficulty in expressing his thoughts in English and the possibility of bias against him. We conclude from our review of the record that he had a fair trial and that the verdict was proper.

*By the Court.*—Judgment affirmed.