BROOK, Plaintiff in error, v. STATE, Defendant in error.

*September 6—October 1, 1963.*

---

[7] *Will of Mechler* (1944), 246 Wis. 45, 16 N. W. (2d) 373.

34

38

For the plaintiff in error there was a brief by *Baumblatt & Goodman* of Racine, and oral argument by *Robert P. Goodman*.

For the defendant in error the cause was argued by *William A. Platz,* assistant attorney general, and *John Peyton,* district attorney of Racine county, with whom on the brief was *George Thompson,* attorney general.

CURRIE, J. Three forms of verdict were submitted to the jury, viz., (1) guilty of murder in the first degree; (2) not guilty; and (3) not guilty by reason of insanity. Defendant's request to submit lesser offenses, namely, second-degree murder, third-degree murder, and manslaughter, were refused.

Defendant raises these two issues on this appeal:

(1) Did the trial court commit prejudicial error in refusing defendant's request for appropriate instructions and alternate verdicts of second-degree murder, third-degree murder, and manslaughter?

(2) Did the trial court err in denying defendant's motion for a new trial in the interest of justice?

*Submitting Lesser Degrees of Homicide.*

The test of whether the trial court commits prejudicial error in refusing defendant's request to submit lesser degrees of homicide than the one charged is whether there is some reasonable ground in the evidence for a conviction of the lesser offense and an acquittal of the greater. *Zenou v. State* (1958), 4 Wis. (2d) 655, 668, 91 N. W. (2d) 208; *State v. Stortecky* (1956), 273 Wis. 362, 369, 77 N. W. (2d) 721; and *Sweda v. State* (1932), 206 Wis. 617, 625, 240 N. W. 369. Remington and Joseph, 1961 Wisconsin Law Review, 528, 542, succinctly state such rule as follows:

"The trial judge is not required to submit a lesser included offense to the jury, unless there is some reasonable ground in the evidence for conviction of the lesser offense and an acquittal of the greater offense." [1]

If the trial court should have submitted a lower degree of homicide under the foregoing rule, its failure to do so

---

[1] The quoted words "lesser included offense" in one sense is slightly inaccurate as applied to some lesser degrees of homicide than first-degree murder. For example, third-degree murder, which embraces felony-murder at common law, embodies an element not necessary to be present in first-degree murder.

results in undeniable prejudice to defendant. *Duthey v. State* (1907), 131 Wis. 178, 182, 111 N. W. 222.

As we view the record the closest question with which we are faced relates to the trial court's failure to submit murder in the second degree. Clearly, neither murder in the third degree nor manslaughter should have been submitted.

Third-degree murder as defined in sec. 940.03, Stats.,[2] is a statutory codification of felony-murder at common law. Defendant contends that the killing of Eiler occurred while defendant was actually engaged in the escape following the burglary at Janesville. We entertain grave doubt that, if the killing had actually occurred during a hot pursuit of defendant and his brother from the scene of the burglary, it would have been "a natural and probable consequence of the commission" of the burglary within the meaning of sec. 940.03. In any event there is no evidence that the burglary had even been detected at the time Officer Eiler stopped defendant's car. Therefore, there was no connection between the burglary and such stopping. As this court remarked in *Hoffman v. State* (1894), 88 Wis. 166, 179, 59 N. W. 588, with respect to a predecessor felony-murder statute:

> "It is not enough that the killing occurred soon or presently after the felony attempted or committed. There must be such a legal relation between the two that it can be said that the killing occurred by reason and as a part of the felony, . . ."

Since the killing of Eiler was not the natural or probable consequence of the commission of the prior burglary, and did not occur by reason of or as part of such burglary, the

---

[2] Sec. 940.03, Stats., provides: "Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

trial court did not commit prejudicial error in refusing to submit the offense of third-degree murder.

Defendant argues that the jury might reasonably conclude from the evidence that defendant was so uncontrollably moved while in the heat of passion in shooting Eiler as to be unable to form the specific intent required for first-degree murder. It is on this premise that he bases his contention that sec. 940.05 (1), Stats.,[3] was applicable and that it was error not to have submitted the offense of manslaughter. The statutory words "heat of passion" were defined by this court in *Zenou v. State, supra,* at page 666, as follows:

"That which will constitute 'the heat of passion' which will reduce what would otherwise be murder to manslaughter 'is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition.' *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N. W. (2d) 721. It has been said that ' "the provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror." ' 21 Am. & Eng. Ency. of Law (2d ed.), p. 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N. W. 55."

Thus, with respect to provocation, the test applied is not the subjective one of whether it was sufficient to produce in

---

[3] Sec. 940.05, Stats., reads: "Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years:

"(1) Without intent to kill and while in the heat of passion."

defendant such passion as to cause him to kill without intent to do so. Rather it is the objective one of whether the provocation would have caused such state of mind in persons ordinarily constituted. Here the provocation relied upon by defendant was Eiler's striking him in the mouth and attempting to pull his gun from the holster. Such conduct does not constitute sufficient provocation to cause such heat of passion in persons ordinarily constituted as to cause them to kill without intent to do so. For this reason, the trial court did not commit prejudicial error in refusing to submit the lesser offense of manslaughter.

Second-degree murder is defined in sec. 940.02, Stats.[4] The state's brief asserts that second-degree murder is first-degree murder without the intent to kill. We concur. The decision of this court in *Zenou v. State, supra,* makes it clear that first-degree murder may be submitted without also submitting second-degree murder where intent to kill clearly appears beyond a reasonable doubt. One of the most-common situations in which a killing properly falls within this statutory definition of second-degree murder is where the actor kills in the heat of passion without such provocation as will reduce the offense to manslaughter. Based upon defendant's testimony alone, without considering the conflicting physical facts brought out by the state's witnesses, there would appear to be a reasonable basis for the jury's finding defendant guilty of second-degree murder. Therefore, the issue, of whether it was prejudicial error not to have submitted second-degree murder, boils down to whether the physical facts brought out by the state, as summarized in the statement-of-facts portion of this opinion, contradicts

[4] Sec. 940.02, Stats., reads: "Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

44

defendant's testimony so as to leave no reasonable basis for a finding of second-degree murder.

This court has held in civil actions that the physical evidence must of course control where it is in clear conflict with the oral testimony. *Strnad v. Co-operative Ins. Mutual* (1949), 256 Wis. 261, 271, 40 N. W. (2d) 552, and *Schulz v. General Casualty Co.* (1939), 233 Wis. 118, 124, 125, 288 N. W. 803. We hold that the same rule applies in criminal actions in determining whether there is any reasonable basis in the evidence for submitting lower degrees of homicide.

The physical evidence clearly establishes these facts: Eiler was beaten unconscious by blows to the right side of the face and forehead. He was then dragged between the Rambler and squad car into the ditch. In so doing a button was ripped off from Eiler's coat at a point two feet south of the snow line. The coat was then pulled off over Eiler's head while buttoned and flung to one side. Up to this point no shooting had occurred, there being no bullet holes in the coat. Thereafter, five shots were fired into the officer's head and chest by defendant at a distance greater than 30 inches away. The close pattern of the five bullet wounds, and the fact that nine and one-half pounds of pressure would have to be exerted in firing all but the first shot, reasonably indicate deliberate action on defendant's part rather than an uncontrolled act of passion. In all likelihood Eiler was shot as he regained consciousness and sat up or endeavored to get to his feet. The squad car was driven ahead over the drag marks when Max Brook stepped on the accelerator while trying to extinguish the portable red signal light. The officer's body was then loaded into the squad car where the easternmost spot of blood was found on the dirt and gravel shoulder.

We conclude that the foregoing physical evidence completely renders unbelievable defendant's testimony that he

shot Eiler under circumstances where intent to kill was absent. No appreciable space of time is required to elapse between the formation of the intent to kill and the act of killing in order for the homicide to be first-degree murder. There being no reasonable ground in the evidence, considered as a whole, for a conviction of second-degree murder and an acquittal of the charge of first-degree murder, it was not error to refuse to submit second-degree murder.

*New Trial in the Interest of Justice.*

Defendant confines his argument, that it was error to refuse to grant defendant's motion for a new trial in the interest of justice, to the expert evidence bearing on defendant's mental condition as it relates to his plea of not guilty by reason of insanity. The trial court in instructing the jury on the insanity issue gave the definition of insanity recommended by the majority opinion in *State v. Esser* (1962), 16 Wis. (2d) 567, 599, 115 N. W. (2d) 505.[5] Defendant only cites to the court the testimony of the two court-appointed experts, Carl F. Buer, a psychologist, and Dr. Glenn A. Bacon, a psychiatrist. These two court-appointed expert witnesses testified that, while defendant was intellectually capable of distinguishing right from wrong, he was emotionally incapable of doing so. Both experts further testified that the alleged murder was a product of mental disorder. Dr. Bacon also testified that defendant is a psychopath.

Dr. Adolph Yale Gerol, a psychiatrist, testifying as a defense witness opined that defendant was a psychopath, now known as a sociopathic personality. This diagnosis was

[5] " 'The term "insanity" in the law means such an abnormal condition of the mind, from any cause, as to render the defendant incapable of understanding the nature and quality of the alleged wrongful act, or incapable of distinguishing between right and wrong with respect to such act.' "

based in part on the fact that he habitually or repeatedly committed crime. Dr. Joseph Weber, a psychiatrist, was called as a rebuttal witness for the state. In his opinion defendant is not mentally ill nor suffering from any recognized defined mental disorder. He also testified that defendant is not a psychopath, and that he knew right from wrong when he shot Eiler and knew the nature and punishable quality of his acts.

On the basis of the foregoing testimony by these four expert witnesses we are not convinced that any miscarriage of justice occurred by the jury's failing to return a verdict of not guilty by reason of insanity. While the greater weight of this testimony establishes that defendant is a psychopath this does not mean that under the definition of insanity laid down in the majority opinion in *State v. Esser, supra,* he should not be held accountable for his criminal acts.[6] This is made abundantly clear by the following excerpts from that opinion (16 Wis. (2d) at p. 594):

"On the other hand the M'Naghten definition tends to reduce the probability that individuals with certain types of mental illness or abnormality will be found insane. . . . The vague term 'psychopath' is used, roughly 'to refer to groups of mentally abnormal individuals who do not fit into the categories of neurosis, psychosis, or intellectual deficiency. . . . Anomalies in their character, emotions, moral sense, or sexual makeup render them incapable of conforming to social standards or of making satisfactory social adjustments. They are largely unable to put themselves in the other person's position and assess the situation from that standpoint. They must have immediate gratification of wants even at the expense of long-term advantages.' Persons so afflicted are less likely to be found insane under the M'Naghten definition and more likely to be so found under the American Law Institute or Durham definitions. Although psychiatrists maintain that many of these people are

---

[6] See *Blocker v. United States* (D. C. Cir. 1961), 288 Fed. (2d) 853, to the same effect.

unable to conform to society's demands and ought to be treated as irresponsible, it seems probable that many individuals who are afflicted with exaggerated, sometimes warped, urges, may well be deterred from unlawful self-gratification by fear of detection and punishment. Society has an interest in prevention of crime which is served by such deterrence. The preference of courts for the M'Naghten definition is doubtless motivated by the thought that it best serves this interest."

The state in oral argument requested that this court definitely declare that psychopaths fall without the pale of such "abnormal condition of the mind" as to bring them within the definition of insanity set forth in the *Esser Case.* We do not deem it advisable to accede to this request because to do so might only further add to the confusion which already exists in this field of criminal law. Further it would freeze into the law a concept with which some psychiatrists now disagree, and in which there is considerable fluidity of scientific knowledge and opinion.

Essentially the insanity defense presents a moral issue to juries in criminal cases as to whether a particular defendant should be held criminally accountable for the offense with which he is charged. We feel that the rather-strict test of insanity now laid down in the *Esser Case* definition of insanity should not be further narrowed, and that juries should have some latitude in making this type of moral judgment.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J. (*concurring*). I agree with the affirmance of the judgment. I conclude, however, that whether or not the physical facts refuted defendant's explanation of the first shot, defendant cannot complain of failure to submit a form of verdict of second-degree murder. In my opinion the defendant is bound by his own testimony and if his version of the affair were believed, the first shot would be an accidental incident of a physical struggle. Defendant had no explana-

tion of the subsequent shots. Defendant's participation in the struggle, as he described it, was not "conduct imminently dangerous to another and evincing a depraved mind, regardless of human life," and, according to him, the purpose in seizing the gun was to put it out of reach.

HALLOWS, J. (*dissenting in part*). I must dissent from that part of the opinion which implies the psychopath "concept" ought not to be frozen into the law because the medical profession may in the future consider it to constitute insanity. The medical terms "psychopath" and "sociopath" contain many concepts which carry different meanings to different psychiatrists. It is not for us to adopt one meaning of the term unless we define it in relation to the legal test of insanity. To date we have implied that psychopath is essentially some form of a personality defect which does not prevent such a person from being responsible under our legal test of insanity even though some schools of psychiatry may consider a psychopath to be medically insane. We must distinguish, as the legal test of insanity does, between legal insanity and medical insanity and not confuse the two. The majority opinion implies that what is now designated as a personality defect under the term "psychopath" may in the future be generally considered by the medical profession to be insanity. If the medical profession does, it would not change the legal test but merely the concept of what medical insanity should embrace. To avoid confusion, it is better for this court to consider individual cases in terms of the legal standard rather than in the language and discipline of the medical profession. For this reason, I would not equate a medical term with its varying medical meanings with our legal standard of insanity or criminal responsibility.