BOYER, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 77–165–CR. Argued September 12, 1979.*
*—Decided October 9, 1979.*
(Also reported in 284 N.W.2d 30.)

For the plaintiff in error the cause was argued by *Ronald L. Brandt,* deputy state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

BEILFUSS, C.J. In this review the defendant claims that the trial court, under the rules of evidence and constitutional due process, erroneously excluded from the evidence police reports which contained exculpatory information; that it was error not to instruct the jury on third-degree murder and homicide by reckless conduct; that evidence is insufficient to support the guilty verdicts as to first-degree murder and attempted arson; and that a new trial should be granted in the interest of justice. We affirm the judgment and the order.

Verona Blessinger was a seventy-three year old woman who lived by herself in the rear of Verona's Tap

located at 3633 West Lisbon Avenue, Milwaukee, Wisconsin. She was known in the neighborhood as an eccentric woman. Because of her distrust of banks she kept bundles of money in various places in her home. Although she no longer operated the tavern as a business, the neighborhood drinkers visited her regularly and were served without charge. These persons, including the defendant, knew that Mrs. Blessinger kept money lying about her home and on occasion talked of stealing it from her. Unknown to them, however, less than a week before her death, Mrs. Blessinger's nephew was named as her trustee and deposited $59,000 in a trust fund in her behalf.

On October 16, 1974, after spending most of the day drinking and playing pool, the defendant returned to his home at about 10:30 p.m. The defendant told his wife Shelley to get dressed and come with him "to the old lady's" house. Shelley Boyer understood the "old lady" to be Verona Blessinger.

The defendant then drove to Verona's Tap. He parked his car on the street alongside the building and he and his wife got out and walked to the side door. According to his wife's testimony, the defendant opened the screen door and knocked. When there was no response he turned to her and said he intended to get money from her one way or the other. He then kicked open the inner door.

Shelley Boyer further testified that the defendant entered the building with a flashlight and she followed. They walked through the kitchen and into the living room where Verona Blessinger had been sleeping on the couch. Shelley Boyer stated that her husband then shined his flashlight directly into Mrs. Blessinger's face and identified himself as a police officer.[1] He asked Mrs.

---

[1] According to Shelley Boyer's testimony, there were no bruises or marks on Verona Blessinger's face when they arrived. The defendant testified that her face was swollen when he first shone his flashlight on her.

Blessinger where her money was. When she did not respond the defendant struck her in her face with his flashlight. Mrs. Boyer said she was unable to say whether the defendant struck Mrs. Blessinger more than once with his flashlight. She did testify, however, that in the darkness she could see the light waving back and forth and that she heard continuous moaning.

The defendant then instructed his wife to search Verona Blessinger's purse. While she was doing so he told her to come back and help him. He handed her a piece of cloth and told her to tie Mrs. Blessinger's legs. As she was doing so, Verona Blessinger was moaning and moving around on the floor. Shelley Boyer testified that her husband then lifted his foot and brought it down "real hard" on the elderly woman's chest. After he stomped on the woman's chest, Shelley Boyer testified, she heard a gurgling noise. When she asked defendant what the sound was he said "she's dying."

Mrs. Boyer then testified that she suggested to her husband that they make an anonymous call for an ambulance, but that he told her to forget it because it wouldn't make any difference. She then left and went out to the car.

The defendant returned to the car a short time later with a cardboard box containing several small bottles of liquor. Shelley Boyer testified that the defendant then suggested that they go to several taverns where they would be seen, which they did. At the "My Way Tavern" he sold the box of liquor that he had taken from Verona Blessinger's house to Wayne Iverson, its owner.

Mrs. Boyer testified her husband then drove around until he found an all-night gas station which had carryout gas cans. She stated that he told her that he intended to use the gas to burn down Verona Blessinger's home. Defendant found a station, bought the gasoline, placed a deposit on the can and returned to Mrs. Blessinger's.

Shelley Boyer testified that she saw her husband enter the building with the gas. He emerged a short time later trailing the gas behind him from the side door to the alley. As she was still waiting in the car she saw flames shoot up from the area he had poured the gas. Her husband then returned to the car and they left. Later, Mrs. Boyer testified, her husband told her that Verona Blessinger was dead when he entered the house and that he had thrown gas around the living quarters when he was inside. She also testified that several days later her husband told her to get rid of her jacket and shoes in case there was blood on them. He then drove her to another part of town and she threw them down a sewer. The jacket and shoes were subsequently recovered by the police from the sewer.

Verona's Tap, however, did not catch fire that evening. Linda Heisel, who lived in a house directly in back of Verona's, testified that on the night of the murder she was awakened by a bright light outside of her window. She looked out her window and saw a fire in the backyard. She testified that she was going to call the fire department but that the fire died so quickly she did not think it was necessary.

The body of Verona Blessinger was discovered at about 10 a.m. on October 17, 1974, by Joseph Benevides and Terry Drotzur who had gone to visit her in the hope of obtaining a free drink. Benevides testified that upon entering he smelled gas. He checked to see if the stove was on, but it was not. At that point he saw Verona lying on the couch with blood all around her. He and Drotzur then ran across the street and had a storekeeper call the police.

Patrolman Ronald Cieski and Lieutenant Carl Ruscitti testified that upon entering Verona Blessinger's home they smelled gas or some kind of inflammable substance. They further testified that they found Mrs. Blessinger

lying on her couch with a white rag tied around her legs. Her face was beaten and swollen and there was blood on the floor and splattered on the wall.

An autopsy was performed by Dr. Joseph F. Kuzma. He found numerous bruises and lacerations about her face and head. The nose, upper jawbone, and cheekbone were all broken. In his opinion these injuries were caused by multiple blows with a blunt object. He also found that eight ribs on each side of the chest were broken. He testified stomping on her chest could have caused these injuries. Dr. Kuzma stated that in his opinion two of the blows were of such severity that either, by itself, could have caused Verona Blessinger's death. In this case, however, he testified that it was his opinion that they had acted in combination to do so.

At trial, two statements by the defendant were received in evidence. On May 7, 1975, after being confronted with several statements of his wife implicating him in the murder of Verona Blessinger and a newspaper article from the Milwaukee Sentinel, the defendant stated to Lieutenant Ruscitti that he had gone to Verona Blessinger's on the night of October 16, 1974, to obtain money from her. He admitted that he had struck her several times with his flashlight or fist, but did not intend to kill her. He also stated that he had lit a fire in the back yard so as to draw attention so that someone would come and attend to Verona.

Also received in evidence was a taped conversation between the defendant and Assistant District Attorney Tom Schulz. In the course of that conversation the defendant also admitted that he had gone to Verona Blessinger's to obtain money and that he had hit her with a flashlight. He stated that although his wife had gone with him it had been his idea to go. He expressed regret and said that maybe he should have let his wife call an ambulance.

At trial the defendant testified that he had been drinking heavily on the 16th of October, 1974. He admitted going to Verona Blessinger's house with the intention of taking money. Upon arriving, he testified, he stumbled into the house and into the living room where he saw Mrs. Blessinger. Her face, he stated, was very swollen. When he asked her where her money was, she came at him with her arms flailing. Boyer testified that he used his flashlight to ward her off and, while doing so, may have struck her with it. He then attempted to grab her and place her on the floor, but in so doing he slipped and fell on her chest. After that she lay there moaning.

The defendant testified that he then went into the kitchen to search for money. As he was going through the cabinets, he stated, he heard a knock at the back door. His wife went to the back door and, attempting to imitate Mrs. Blessinger, asked, "Who is it?" A voice then answered, "It's me, Pete Korn. Can I come in?" Shelley, according to the defendant, then turned the person away by saying that she did not feel well. This is contrary to the testimony of Shelley Boyer. She denied hearing any knocks while she was in the building. Nor did the defendant mention this incident in any of his statements prior to his trial.

Defendant also testified that he saw his wife kick Mrs. Blessinger very hard on the side of the head as she raised herself on one elbow, and that she tied something around the woman's legs. He stated that he attempted to stop her and that they then picked Mrs. Blessinger up and put her on the couch.

The defendant further testified that it was his wife's idea to burn down the house. He stated that he agreed to do so but when he returned to the house with gas he saw Verona lying on the couch moaning and changed his mind. He denied pouring any gas inside the house but

stated he only poured it in one spot and lit it in order to attract attention.

As part of his defense the defendant tried to introduce into evidence at trial seven police reports regarding the involvement of one Peter Korn in the murder of Mrs. Blessinger. Korn had been initially charged with the offense after having made several statements in which he claimed to have killed her. Korn made these statements in the presence of several persons including Esther Kaufert, Joseph Chapman and Russell Merrill. Esther Kaufert went to and informed the police of these events. Esther Kaufert stated she went to the police because she wanted to help Peter Korn. The police then took statements from Kaufert, Chapman, Merrill and Korn. All three of these persons as well as Korn himself had testified regarding Korn's statements at his preliminary examination. Subsequent to that examination the charges against Korn were dismissed. At the preliminary Korn denied he had anything to do with Verona's death. Korn presented himself for a lie detector test. The lie detector examiner stated Korn was not given the test because his mental capacity was so low that he was unsuitable for testing. The charges were later reissued but were again dismissed after Mrs. Boyer volunteered her statements to the police. The reports defendant sought to introduce at trial contained summaries of police interviews with the people who were present when Korn made his incriminating statements.

The trial court refused to receive the police reports into evidence. Although the grounds for the trial court's ruling are unclear, from the record it appears that the reports were refused because the persons whose statements they contained had appeared at a preliminary examination and testified under oath and subject to cross-examination regarding what Peter Korn had said to them.

Esther Kaufert did testify for the defendant and recounted Peter Korn's admissions to Merrill, Chapman and herself. Defense counsel did not introduce the transcript of the testimony at Korn's preliminary examination into evidence, although advised by the court he could do so.

Other than Mrs. Kaufert and the defendant himself, only one other witness testified for the defense. This was Jerome Lutz, a fellow inmate of the defendant's at Waupun. Lutz testified that on a visit to Waupun Mrs. Boyer had stated to her husband that the district attorney had threatened to give her ten years if she didn't testify against her husband and that she had told her husband that she wasn't going to jail for anyone. She also stated that her husband had not hurt anyone in the first place, according to Lutz's testimony.

After both sides had rested, the court asked them to submit jury instructions. The defendant's request for instructions as to third-degree murder and homicide by reckless conduct were denied. The jury was instructed as to first and second-degree murder.

The state does not argue, nor could it in light of *Chambers v. Mississippi*, 410 U.S. 284 (1973), that the statements of Peter Korn confessing guilt in the death of Verona Blessinger were immaterial or irrelevant. If, as Peter Korn stated on several occasions, he did kill Verona Blessinger, then the statements were exculpatory as to the defendant and material and relevant. "When the guilt of another person is inconsistent with the guilt of the defendant, it is relevant for the defendant to present evidence that such other person committed the crime." 1 Wharton's, *Criminal Evidence*, p. 404, sec. 195. The state does contend that the police reports sought to be introduced by the defense contain only *inadmissible*

hearsay and therefore were properly excluded under sec. 908.02, Stats.

The defendant, on the other hand, argues that the police reports are admissible under sec. 908.03(8), Stats., as an exception to the hearsay rules. The section provides as follows:

"(8) PUBLIC RECORDS AND REPORTS. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law, or (c) in civil cases and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law,. unless the sources of information or other circumstances indicate lack of trustworthiness."

While the reports would appear to be initially admissible under this section, this does not end the inquiry— the question remains, are they trustworthy. If there are portions of the reports which are inadmissible under the Evidence Code for other reasons, then those portions must be excluded even though the report as a whole is admissible. In *Mitchell v. State*, 84 Wis.2d 325, 330, 267 N.W.2d 349 (1978), this court held that statements made to an arresting officer over the phone by the victim of a crime were inadmissible, even though contained in a police report which was properly admissible under the business records exception to the hearsay rule:

"In admitting these reports into evidence at the preliminary examination, the court relied on sec. 908.03(6), Stats., the so-called business records exception. This exception allows the introduction of documents made in the course of a regularly conducted activity, which includes police reports. When the report contains out-of-court assertions by others, an additional level of hearsay is contained in the report and an exception for that hearsay must also be found. Sec. 908.05, Stats. That is, the re-

ports cannot establish more than their maker could if he was testifying in court on their subject matter. Thus, defendant's hearsay objection is not to the details of which the officer had personal knowledge but to the repetition of declarations made by Hurst to the officer over the phone. The business records exception does not allow admission of this second level of hearsay."

As in Mitchell, the police reports the defendant attempted to introduce in this case contain out-of-court assertions by others. In fact the reports in question contain not two, but three levels of hearsay. In addition to the statement of the police officer represented by the report itself, there are the statements of those persons interviewed and also the statements of Peter Korn himself.

Sec. 908.05, Stats., states when multiple hearsay is admissible.

"908.05 **Hearsay within hearsay.** Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in this chapter."

Although the language of the statute refers only to double hearsay, it is generally thought applicable to situations involving more than two levels of hearsay. The judicial Council Committee's comments to the Wisconsin Rules of Evidence do not address the issue. With regard to the identical federal rule, however, Weinstein's *Evidence* indicates that the rule "places no restrictions on the number of stages of hearsay involved." 4 Weinstein's, *Evidence,* sec. 805–5. But with every increased level of hearsay, the author cautions, there is a corresponding decrease in reliability and a trial judge would certainly have discretion under sec. 904.03, Stats., to exclude multiple hearsay, even if each portion conforms to a statutory exception, where he finds the statement

so unreliable that its probative value is substantially outweighed by the danger of prejudice and confusion.

Assuming that "triple" hearsay could be admissible under sec. 908.05, Stats., and applying that section here in order for the police reports to be admissible, each part of the combined statements must conform with an exception to the hearsay rule. As already discussed, the police report itself conforms with the exception stated in sec. 908.03(8). Korn's statements fit under sec. 908.045(4). Under that section statements made against the declarant's penal interest are admissible when the declarant is unavailable as a witness. There is no dispute here that Korn's statements are contrary to his penal interest and that, at the time of trial, he was unavailable to testify as a witness. It is with respect to the second level of hearsay, however, that difficulty arises.[2]

Of the persons interviewed by the police, only Russell Merrill, Joseph Chapman and Esther Kaufert admitted hearing Korn confess to the Blessinger killing. Statements of other persons contained in the reports were irrelevant to defendant's contention that Peter Korn actually killed Verona Blessinger and were therefore clearly inadmissible.

Also, with respect to the statements by Esther Kaufert, even if admissible under an exception to the hearsay rule, we find no ground for admitting them into evidence. She testified at the trial and related all she had told to the police. Her statements at the trial were in substance the same as in the police records. Admission

---

[2] Neither at the preliminary examination, nor in statements given directly to the police, did Korn ever admit or implicate himself in the killing of the victim.

of her statements would serve no useful purpose and would be merely repetitive.

Neither Chapman nor Merrill were available to testify at trial. The defendant argues that their statements contain sufficient indicia of trustworthiness and should be admitted. Under sub. (6) of sec. 908.045, Stats., statements not specifically covered by that section may be admissible if they have comparable guarantees of trustworthiness. Arguably, then, the statements of Merrill and Chapman would fit under this exception. The trustworthiness of their statements is guaranteed by the fact that they corroborate each other and were made to the police. Although these guarantees are substantial, in this case that should not be deemed sufficient, particularly where substantially the same evidence was properly and expressly admissible under our evidence code. The trial court ruled that the defendant was free to introduce the transcript of Korn's preliminary examination at which Chapman and Merrill, as well as Korn, had testified.

The defendant states in his brief that the Chapman and Merrill statements contained in the police reports were intended "to provide corroboration that indeed Peter Korn had made statements." In *Wilder v. Classified Risk Ins. Co.*, 47 Wis.2d 286, 177 N.W.2d 109 (1970), this court held that it is error for a trial court to allow into evidence hearsay intended to prove that another person made a certain statement when whether or not the statement was made is not in issue. In that case a police officer was permitted to testify as to what a witness to a traffic accident had told his partner regarding the accident. The trial court instructed the jury that it was not to consider the statement of the police officer as evidence of what actually occurred, but only as evidence of what a witness said. This court ruled that the

trial court committed error. "Unless there is such an issue of whether a statement was in fact made, the hearsay statement should not be admissible because it is immaterial and there is great danger the jury, in spite of instructions, will use the hearsay evidence as proof of what the statement says." 47 Wis.2d at 291.

In the case now before the court it appears from the record that the fact that Korn made incriminating statements on several occasions and in the presence of several different people, including Merrill and Chapman, was not at issue. Kaufert had testified that he had and the state did not contest it. The hearsay evidence contained in the reports was of questionable trustworthiness; the jury was aware that Korn had stated to others that he killed the victim; the defense could have introduced the transcript of Korn's preliminary examination where both Merrill and Chapman testified. Under these circumstances the trial court did not abuse its discretion in excluding it.

The fact that the police reports were properly excluded under the Wisconsin Rules of Evidence does not, however, completely settle the question. In *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), the United States Supreme Court stated that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Defendant contends that the exclusion of the police reports had the effect of denying him a fair trial and due process of law.

The court in *Chambers* states that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." 410 U.S. at 294. The defendant in

that case had been denied the right by the application of state rules of evidence which, in effect, prevented him from presenting to the jury evidence that a third person committed the crime. Although the defendant was able to introduce into evidence a signed written confession of the third person, he was unable to directly challenge the witness' renunciation of his confession because of the trial court's ruling that he was not sufficiently adverse to allow defendant to cross-examine him. The defendant was also prevented from introducing testimony from three other persons that they had heard the third person confess shortly after the crime on the ground that such testimony would be hearsay. "Chamber's defense," concluded the court, "was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted." 410 U.S. at 294.

The case before the court is clearly distinguishable from *Chambers* in several respects. First, defendant was not denied by the state the opportunity to cross-examine Korn regarding his earlier statements. He was unable to do so only because of Korn's unavailability at the time of trial. The state had made every effort to find him, as well as Chapman and Merrill, in order to have them available for the defendant's trial.

Secondly, the state did not prevent defendant from bringing to the attention of the jury the fact that Korn had made his admissions to several other people on several different occasions. In fact, the jury was informed of this through the testimony of Esther Kaufert. Moreover, the defendant was free to introduce further evidence of Korn's several admissions in the form of the transcripts of Merrill's and Chapman's testimony at Korn's preliminary examination. His decision not to do so cannot be chargeable to the state.

 The only effect of the trial court's ruling was to prevent the use of the twice removed statement of Korn contained in the police reports. This did not deprive the defendant of a fair trial under the circumstances of this case nor deny him due process of law.

 The defendant next contends that it was error for the trial court to refuse his request for instructions as to third-degree murder and homicide by reckless conduct. As this court has stated on numerous occasions, instructions on lesser offenses are to be given to the jury where the evidence reasonably admits of conviction on either the greater or the lesser offense. In *State v. Anderson,* 51 Wis.2d 557, 560, 187 N.W.2d 335 (1971), the court stated the rule as follows:

> "To justify submitting lesser degrees of homicide than that charged in the information, there must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction on the lesser."

 In determining whether there is a reasonable basis in the evidence for acquittal on the offense charged and conviction on the lesser offense, this court has stated that "the evidence is to be viewed in the most favorable light it will reasonably admit from the standpoint of the accused." *Jones (George Michael) v. State,* 70 Wis.2d 41, 48, 233 N.W.2d 430 (1975).

 This does not mean, however, that instructions as to lesser offenses are to be included automatically upon request.

> "The key word in the rule is 'reasonable.' The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a

jury. Only if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury." *State v. Bergenthal,* 47 Wis.2d 668, 675, 178 N.W.2d 16 (1970).

Indeed, this court has on several occasions pointed out that it is error to instruct the jury as to lesser offenses when the evidence does not so warrant.

"The early cases point out and emphasize and we must stress again, because the question keeps recurring, that a determination of whether an instruction on a lesser included crime should be given to a jury is not solved by merely determining the crime charged includes the lesser offense because juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of. *Weisenbach v. State* (1909, 138 Wis. 152, 119 N.W. 843. The evidence must throw doubt upon the greater offense. Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. They are bound by the evidence and should be limited to those included crimes which a reasonable view of the evidence will sustain and does not convince beyond a reasonable doubt the additional element of the greater crime existed. "We are urged by Melvin to change this rule so that all included crimes or at least those requested by counsel would be charged even though the evidence may not raise a reasonable doubt of the sufficiency of the proof of the greater crime. We decline to do so. The present rule is just both to the accused and the state." *State v. Melvin,* 49 Wis.2d 246, 253, 181 N.W.2d 490 (1970).

This court has consistently held that in order to justify submitting an instruction on third-degree murder the evidence must reveal a reasonable doubt as to both first

and second-degree murder.[3] If, however, the trial court fails to submit instructions on the lesser included offense when, as a matter of law it should, its failure to do so constitutes prejudice to the defendant.[4]

The defendant contends that under his version of what occurred there was a reasonable basis for the jury to conclude that he unintentionally caused Verona Blessinger's death as a natural and probable consequence of the commission of a felony contrary to sec. 940.03, Stats., Wisconsin's third-degree murder statute.[5] He argues the jury could have found that Verona Blessinger was already beaten when he arrived at her house and that he unintentionally struck the fatal blow in attemping to ward her off with his flashlight or when he fell on her while attempting to place her on the floor.

Where a defendant's testimony appears to offer a reasonable basis for submission of instructions on a lesser offense, but the physical evidence contradicts that testimony so as to leave no reasonable basis for a finding of the lesser offense, the refusal to give such instructions is not error.[6]

[3] *Harris v. State,* 68 Wis.2d 436, 442, 228 N.W.2d 645 (1975). *See also Wilson v. State,* 59 Wis.2d 269, 284, 208 N.W.2d 134 (1973).

[4] *Brook v. State,* 21 Wis.2d 32, 40–41, 123 N.W.2d 535 (1963); *State v. Stortecky,* 273 Wis. 362, 77 N.W.2d 721 (1956); *Duthey v. State,* 131 Wis. 178, 111 N.W. 222 (1907). *See also* Remington and Joseph, *Charging, Convicting, and Sentencing the Multiple Criminal Offender,* 1961 Wisconsin Law Review 528, 542.

[5] Sec. 940.03, Stats., 1975 (since repealed).

"940.03 **Third-degree murder.** Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

[6] *Brook v. State,* supra, 21 Wis.2d at 43–44.

As incredible as defendant's testimony may appear, there is little physical evidence to disprove his contention. If his explanation is to be believed, all of the victim's injuries were not caused by defendant's claim of merely warding her off with his flashlight and falling on her.

The state argues that if Mrs. Blessinger's death occurred as the defendant claims, then he is guilty of no offense, not even third-degree murder or homicide by reckless conduct. For under defendant's version of the facts, he at worst caused Verona Blessinger's death by accident and accidentally causing death is not a crime. Murder in the third degree would not apply because Mrs. Blessinger was not killed as a natural and probable consequence of the commission of or attempt to commit a felony. The state contends the death was not a natural and probable consequence of the theft by the defendant.

The defendant was charged and convicted not of theft but of armed burglary. Armed burglary is clearly a felony under Wisconsin law. The second contention that the death of Verona Blessinger was not a natural and probable consequence of that crime, however, bears further consideration.

"Third-degree murder as defined in sec. 940.03, Stats., is a statutory codification of felony-murder at common law." *Brook v. State, supra,* 21 Wis.2d at 41. In *Hoffman v. State,* 88 Wis. 166, 179, 59 N.W. 588 (1894), with respect to a predecessor felony-murder statute, this court remarked:

"It is not enough that the killing occurred soon or presently after the felony attempted or committed. There must be such a legal relation between the two that it can be said that the killing occurred by reason and as a part of the felony. . . ."

In that case the court held that a death which occurred during a struggle after the defendant had assaulted a third party could not be found to be third-degree murder.

■

The defendant is bound by his own testimony.[7] If his version of the affair was believed by the jury his physical contact with the deceased was accidental and did not constitute a crime at all, much less was the death a natural probable consequence of the burglary.

■

There is no reasonable ground in the evidence, considered as a whole, for a conviction of third-degree murder and an acquittal of the charges of first-degree murder and second-degree murder. It was not error to refuse to submit third-degree murder.[8]

Defendant also contends that the trial court erred in refusing to instruct the jury on homicide by reckless conduct. Reckless conduct is defined in sec. 940.06, Stats., as follows:

"(2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin."

■

Both the evidence of the state and the defendant's own testimony establish that he did not engage in reckless conduct. Waiving a flashlight in the air and attempting to set a person down on the floor are not acts which create a situation of unreasonable risk and high probability of

---

[7] Id. at 47.
[8] Id. at 45.

death or great bodily harm to another, or which demonstrate a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. In other words, even if defendant unintentionally caused the death of Verona Blessinger, it was not by his engaging in reckless conduct.

Defendant also claims that the evidence adduced at trial was insufficient to support the jury's verdicts that the defendant was guilty of first-degree murder and attempted arson. This court recently described its rule in passing on such an issue as follows:

"This court's review is limited to determining whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove defendant's guilt beyond a reasonable doubt. *State ex rel. Kanieski v. Gagnon,* 54 Wis.2d 108, 113, 194 N.W.2d 808 (1972). The jury may convict on the basis of uncorroborated testimony, *Grayson v. State,* 35 Wis.2d 360, 366, 151 N.W.2d 100 (1967), unless that testimony is patently or inherently incredible. *Gauthier v. State,* 28 Wis.2d 412, 418, 137 N.W.2d 101 (1965). Inconsistencies and contradictions in a witness' testimony are for the jury to consider in judging credibility and the relative credibility of the witnesses is a decision for the jury. *Kain v. State,* 48 Wis.2d 212, 217, 179 N.W.2d 777 (1970). The jury may consider a witness' motives in this weighing process. *State v. Harling,* 44 Wis.2d 266, 276, 170 N.W.2d 720 (1966)." *Kohlhoff v. State,* 85 Wis.2d 148, 153–54, 270 N.W.2d 63 (1978).

Applying these considerations to the case before the court, it is clear that there was ample evidence upon which the jury could base its findings.

Dr. Kuzma, the medical examiner, testified that Verona Blessinger died from a combination of blows to the head and to the chest, either one of which was capable by itself of causing death. Shelley Boyer testified that

she saw her husband strike Verona Blessinger in the face with his flashlight at least once and stomp "real hard" on her chest. Her testimony also supports the inference that defendant repeatedly struck the decedent about the face with his flashlight.

■

This same evidence supports not only the finding that the defendant caused Verona Blessinger's death, but also that he intended to do so. This court has repeatedly stated that:

"While intent is a state of mind, it is not to be determined apart from the actions of the person involved. The state of mind or intent may reasonably be ascertained from the acts and conduct of a defendant, and the inferences fairly deducible from the circumstances." *Jacobs v. State,* 50 Wis.2d 361, 365–66, 184 N.W.2d 113 (1971); *Johnson v. State,* 85 Wis.2d 22, 32, 270 N.W.2d 153 (1978).

■

It cannot be denied that death is a natural and probable consequence of the beating suffered by this seventy-three year old woman, namely blows to the head and face and stomping with all one's force upon her chest as she lay on the floor. Since the jury had sufficient evidence to find that defendant so conducted himself, it also had sufficient basis upon which to find that the defendant intended the result he caused.[9]

In addition to the manner in which death was caused, there is further evidence upon which the jury could have based its finding on intent. Shelley Boyer testified that when she asked the defendant about the noise the deceased was making after he had stomped on her, he replied, "she's dying." When she suggested that they anonymously call an ambulance he told her to forget it, it wouldn't make any difference. This statement was corroborated by defendant's taped statement to Assistant

---

[9] *See State v. Wells,* 51 Wis.2d 477, 187 N.W.2d 328 (1971).

District Attorney Schulz. Finally, the fact that defendant attempted to burn down Verona Blessinger's house with her still inside so as to destroy the evidence is consistent with an intent to kill.

The defendant's contention that the evidence is insufficient to support the jury's finding of guilt with respect to the attempted arson charge is likewise without merit. His wife testified and the defendant admitted that he bought gas and returned to Verona Blessinger's house for the purpose of burning the building down. His wife testified that she saw him lay down a trail of gas from the house to the garage and that he later told her he had sprinkled gas around inside the living quarters. He also admitted lighting the gas but claimed that he had done so only to attract the attention of others. The jury was perfectly justified in disbelieving, as it did, the defendant's claim of a change of heart, particularly in light of the testimony of others that they smelled a gas-like substance in Verona Blessinger's living room on the morning after her death. There is sufficient credible evidence to support the conviction of attempted arson.

Lastly, defendant asks this court to grant a new trial in the interest of justice pursuant to sec. 251.09, Stats. Sec. 251.09 provides that this court may, in its discretion, reverse the judgment and order a new trial where it appears that the real controversy has not been tried or that there has been a miscarriage of justice. The court has stated that a new trial in the interest of justice should be granted only when it is apparent that the defendant should not have been convicted and when a new trial will probably result in an acquittal. *White v. State*, 45 Wis.2d 672, 681, 173 N.W.2d 649 (1970) ; *Okrasinski v. State*, 51 Wis.2d 210, 219, 186 N.W.2d 314 (1971). No such circumstances are present here.

*By the Court.*—Judgment and order affirmed.