STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Lennon WILLIFORD, Defendant-Appellant.†

Supreme Court

*No. 79–1789–CR. Argued June 3, 1981.—Decided June 30, 1981.*

(Also reported in 307 N.W.2d 277.)

† Motion for reconsideration denied, without costs, on August 11, 1981.

For the petitioner the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the appellant there was a brief and oral argument by *Michael Yovovich,* assistant state public defender.

COFFEY, J. This is a review of a decision of the court of appeals reversing a judgment of conviction and

order denying a motion for post-conviction relief and remanding the case to the circuit court for a new trial. The judgment of conviction and order were entered in the circuit court for Racine county, the Hon. RICHARD G. HARVEY, JR., presiding.

Following a jury trial, the circuit judge convicted the defendant, Lennon Williford, of first-degree murder and sentenced him to life imprisonment. A post-conviction motion filed by Williford challenging his conviction was denied and he appealed from the judgment of conviction and the order denying post-conviction relief. The court of appeals reversed the circuit court's judgment and order on the ground that the trial judge committed prejudicial error in failing to instruct the jury on the lesser included crime of manslaughter (heat of passion), sec. 940.05(1), Stats.[1] The state appeals from this ruling.

The criminal complaint, filed on November 28, 1978, charged Williford with the first-degree murder of his estranged wife, Annabelle, in the early morning hours of November 25, 1978. After a jury trial in which Williford admitted killing his wife, he requested the submission of the lesser included crimes of first-degree murder, second-degree murder and manslaughter (heat of passion.) The trial judge submitted verdicts on first- and second-degree murder, but, after reviewing the testimony, rejected the request to submit a verdict on manslaughter (heat of passion), stating, "I am satisfied there is no basis in the law and I can't do it, unless there is a legal basis for it and factual basis and taking his statement [Williford's testimony] at [sic] an ab-

---

[1] Sec. 940.05(1), Stats., provides:

"**Manslaughter.** Whoever causes the death of another human being under any of the following circumstances is guilty of a Class C felony:

"(1) Without intent to kill and while in the heat of passion; . . ."

solute verity, there is no basis, not even a shred." The jury returned a verdict finding Williford guilty of first-degree murder.

In a post-conviction motion, Williford, among other things, argued that the failure of the circuit court to submit a verdict on manslaughter (heat of passion) constituted prejudicial error. The trial judge denied the defendant's motion after the hearing and affirmed his prior ruling, finding "there was absolutely no basis whatsoever for submitting the manslaughter heat of passion instruction."

Williford appealed to the court of appeals and the appellate court stated the dispositive issue was: Did the evidence, when viewed in the light most favorable to the defendant, demonstrate that Williford had been subjected to such reasonable, adequate provocation as to require submission of the crime of manslaughter in the heat of passion? Upon review, the court concluded that the evidence was sufficient in this respect.

There is no dispute that Annabelle Williford died from a gunshot wound to her chest inflicted by her husband, Lennon Williford, on November 25, 1978, at approximately 2 a.m. The post-mortem examination revealed that she had been shot at least four times with a .22-caliber pistol, and death resulted from massive hemorrhaging in her left chest caused by a rupture of the aorta. At the time of the killing, Annabelle and Lennon were separated and Annabelle was seeing another man. The defense theory was that these facts, together with evidence of the couple's continual unhappy, hostile, mutually abusive and quarrelsome relationship and argument on the morning of the shooting raised a reasonable doubt as to the element of specific intent to kill necessary for a conviction of first-degree murder and thus presented a jury question as to whether Williford acted

in the heat of passion and was there reasonable and adequate provocation for the killing of his estranged wife.

The record demonstrates that Annabelle and Williford met and began dating in 1965. The couple lived together for a substantial period of time and twin boys were born to them in 1970, some six years before their marriage in May of 1976. Annabelle and Lennon had many disagreements about money and their respective involvement with other men and women throughout the course of their relationship and they periodically broke up and reunited. These quarrels frequently involved not only verbal abuse, but mutual physical violence as well. There was evidence received at trial that revealed that on two occasions Annabelle had drawn a gun on Williford in the last two and one-half to four years before the killing, and on one such occasion shot toward Williford with the bullet striking a wall. There was also evidence that the couple engaged in a violent quarrel not "too long" before the fatal shooting in which Annabelle took a stick to Lennon and beat him over the head and Lennon retaliated by striking her while trying to disarm her.

On September 22, 1978, some two months before the killing, Annabelle filed a petition for a legal separation in the family court branch of the Racine county circuit court, claiming as grounds therefor, that Williford was an alcoholic and that he failed to provide adequate support. At this time, the couple was living with their two children and Annabelle's two children by a previous marriage. The couple had their first hearing with the family court commissioner on September 29, 1978, and Williford testified that the court commissioner represented to him that Annabelle wanted to save the marriage. He stated that in an effort to effect this purpose, he agreed to give Annabelle his weekly payroll checks and that she was to return a weekly stipend of $30.

Williford recited that they continued to live together after the hearing and that even though he complied with all the terms of the agreement, Annabelle would take his checks on Friday and he "would not see her from Friday to Sunday." Thus, Williford stated he became upset and displeased with the agreement and arranged for another conference with the family court commissioner.

During the pendency of this hearing, Williford became aware that his wife was dating another man. On October 22, 1978, approximately one month prior to the killing, Williford followed Annabelle with her boyfriend in her car to a motel in Oak Creek, Wisconsin. After inquiring of the motel manager, he learned that Annabelle had been there frequently. When Annabelle and her companion exited one of the motel units, they walked over to Williford and he asked his wife to "come home with him." She refused, stating that she was staying with her friend. Williford moved out of their apartment the following day, October 23, 1978. A police officer who Williford summoned to the scene and asked to go into the motel to get his wife testified that Lennon was "calm" during this episode.

Following the motel incident and around the end of October, 1978, Annabelle brought her paramour to two hearings before the family court commissioner. Williford and his divorce counsel testified that this upset Lennon very much. After these hearings, the court commissioner issued a temporary order, *inter alia*, requiring Williford to pay $100 a week for support and maintenance and giving Annabelle custody of their children and their home. Williford was given reasonable visitation rights.

Two further pre-murder incidents are relevant to this controversy. The record demonstrates that on November

4, 1978, some three weeks before the killing, Lennon attacked his estranged wife when she stopped her car at a scene where he was receiving a speeding ticket and allegedly "cursed him out" as she walked past his car window. At trial, there was a dispute as to what Annabelle said, but, according to Williford, she stated "You old gray mother . . . . You have been running around telling me a damn lie, paying my son to stay away from home," and told him to "kiss her behind" as she walked away. On the other hand, Annabelle's daughter, Dana Fraline, who was present at the scene, denied that her mother said anything. Following the alleged verbal exchange, Williford jumped out of his car, chased, grabbed, pushed and kicked her before an officer intervened and conveyed him to the police station.

Dana Fraline also testified that following this incident, Williford called her mother about a week later concerning the altercation and that she overhead him arguing with Annabelle and threaten to kill her while she was listening on an extension phone, stating, "Listen here, you're going to wind up—and I'm going to kill you." Williford admitted making the phone call, but denied arguing with his estranged wife.

Williford testified that about a week after he was stopped for speeding, (November 11th) Annabelle contacted him and asked him to come over to her apartment and help her start her car. After some resistance, Williford complied and went to Annabelle's home at about 1:30 p.m., but was unable to start the car. Williford testified that at that time he "told her—I sat there thinking over everything that had happened and I told her I love you very much and I wished she would think about a chance of us getting back together. What you have done, I will try to forgive you and forget all about it and so let's get back together and raise the kids."

Lennon returned later that evening to try to start the car. When he arrived, he found a man other than the boyfriend he had seen her with on previous occasions, sitting in her living room. She told Lennon that this man was a "salesman." He didn't believe her and asked her if she still wanted him to start the car. She replied yes and he succeeded in starting the car and stated he was embarrassed and departed.

On the date of the killing, November 25, 1978, Williford arrived around 1 a.m. at his estranged wife's residence at 5407 Byrd avenue ostensibly to see his daughter, Wanda, by a previous marriage, as Annabelle had told him his daughter was staying there. Annabelle answered the door, stating that Wanda was asleep. Williford testified that he told Annabelle he would return the next day, but that Annabelle invited him in, stating that their children said he wanted to talk to her. Williford replied "I don't think this is the right time for you and me to talk," but, nevertheless, accepted the invitation and went in and sat down on a love seat in the living room. At this time, Wanda, who was sleeping on the living room sofa, woke up and asked Williford what he wanted. He replied that it could wait until the next day, and Wanda subsequently fell back asleep.

Williford had been drinking that evening and a short time after arriving, went out to his car, brought a pint of gin in and poured a drink for Annabelle and himself. According to Williford, the couple just sat and talked for a while, but the visit grew hostile and an argument, lasting two to three minutes, ensued when he told her he had talked to their children that day and that he wanted to reconcile their differences. He said that in response to this statement, she began yelling at him, calling him a "stupid old son-of-a-bitch," and told him that their relationship was over. Williford's reply was he came

there to talk to his daughter and not to "get embarrassed and neither to hurt your [Annabelle's] feelings" and "if that is the way you feel about it, I will get up and go." He recited that as he got up, Annabelle informed him that she was going to marry her "young man" (boyfriend) soon, and he replied that it didn't matter to him what Annabelle did as long as she didn't bother him. At this point, Williford's testimony was vigorously contested as to the ownership of the murder weapon and the facts and circumstances surrounding the possession of the gun at the time of the shooting. Williford testified that Annabelle reached into her purse, pulled out a gun and exclaimed "I am going to blow your brains out." Williford stated that he ran toward her and she did not attempt to shoot him; a struggle ensued and, as he wrested the gun from her, she told him to "get [his] damn ass out of there." He replied he "was not leaving while she had the gun." On the other hand, the prosecution presented testimony to the effect that Williford had the murder weapon in his possession in his car two days before the killing, November 23, 1978, and argued to the jury that when he left the apartment to get the gin, he removed the gun from his car, took it into the apartment and fired the fatal shots. The prosecution further introduced evidence to the effect that on November 24, 1978, approximately six and one-half hours before the shooting, Annabelle did not have a gun in her purse. Williford testified as to a complete blank and loss of memory as to all events that followed his wresting of the gun from Annabelle until he "came to" when he was walking out the door with the gun in his hand and his daughter, Wanda, was hitting him on the back and asking him why he did it. He also remembered looking at his stepdaughter, Dana Fraline, and hearing her scream. Williford testified that as he left he realized that he had shot Annabelle and de-

cided that the best thing he could do was to report it to the police. His testimony on this point was: "Well, when I left from there I guess. I don't know what happened, but things started coming back to me and I said what happened and I said well, I know I shot her and I believe the best thing for me to do is to go to the police station and I got in my car and drove straight to the police station then."

Wanda Williford testified that after she went back to sleep on the living room couch, after Williford's arrival but before the shooting, she vaguely remembered hearing a scream and awoke to the sound of gunshots. She then saw Annabella lying on the floor and realized what was happening and stood up on the couch screaming to her father "Dad, dad, stop, stop. What are you doing?" She stated that Williford didn't respond and she heard at least two more gunshots and a clicking sound in the gun. After the clicking ceased, Wanda ran over to Williford as he was walking out the door and started "beating" him on the back asking "Why, why, why did you do it? Why did you do it?" Williford again failed to answer, but just hung his head down and, according to Wanda, had a "real blank, . . . weird expression on his face as if he was not really there," and looked "sad," "solemn," "dejected or depressed."

Dana Fraline, Annabelle's 14 year-old daughter, another eyewitness to a part of the murder episode, testified that she was asleep upstairs in Annabelle's apartment when she was awakened by the sound of gunshots coming from downstairs. She "jumped up" and ran to the landing between the first and second floors where she saw Williford firing the gun. She ran down the steps into the living room and saw Annabelle lying on the floor near a table. At this time, she stated she heard neither Annabelle nor Williford say anything, but both

were breathing very heavily and Annabelle was motion-
less as she lay dying on the floor. Dana observed Willi-
ford look toward her and "run" out of the house with
the gun in his hand. She described the look on his face
evincing surprise to see her and refuted the defense coun-
sel's suggestion that Williford looked as though he was
in shock. Dana recited that she heard the gun go off at
least three times as she came down the stairs and "click"
at least twice after Williford had fired all the live am-
munition.

The defendant arrived at the Racine police station at
about 2:46 a.m. and volunteered several statements to
the officers and the other personnel present. Rita Ress,
the "counter girl," testified that Williford told her "I
made a mistake," "I shot my wife," and that he came
there to confess. Ress further recited that Williford
stated, "there was too much pressure and . . . his wife
was going with this guy and that guy and they were—
going to get back but then she went out with someone
else and it was too much pressure and she should not
have done it." She characterized Williford as "very sad,"
"very calm" and "very nice." She also testified that the
Byrd avenue address was about 10 to 15 minutes from the
police station.

Two Racine police department patrolmen, Jonathan
Petit and Herbert Nikolai, were called to the counter to
take Williford into custody. Officer Petit searched Willi-
ford and found a revolver, later identified as the murder
weapon, in his right-coat pocket. Petit opened the re-
volver and found nine expended .22-caliber cartridges. As
Petit was frisking the defendant, Patrolman Nikolai
heard Williford state that he "didn't mean to do it." Wil-
liford was placed under arrest and while he was being
given his *Miranda* rights, Officer Nikolai informed him
that Annabelle had died from the gunshot wounds and

formally advised him he was being charged with murder in the first degree. Nikolai testified that at this time, Williford appeared to break down and said something to the effect of "I know I shot her but I didn't think I killed her." After Williford was informed of his *Miranda* rights, he declined to answer any questions before speaking with an attorney and the officers escorted him to the cell block area for booking. Petit testified that while they were walking to the cell block area, Williford volunteered a statement "to the effect that he had gone [to 5407 Byrd avenue] to straighten things out and things had gotten out of hand."

During the time they spent with Williford at the time of his arrest the officers noted that Williford smelled of alcohol, but was normal and under control of his faculties as he had no difficulty walking, speaking or understanding or answering the booking questions.[2] Petit testified that "his whole demeanor was calm," and "there was no beligerancy [sic] on his part at all."

The issue presented for our consideration is: Did the trial court commit prejudicial error in refusing to instruct the jury and submit a verdict on manslaughter (heat of passion)?

The standard for determining whether an instruction on a lesser degree of homicide should be submitted to the jury has been clearly stated in *Ross v. State,* 61 Wis.2d 160, 169, 211 N.W.2d 827 (1973), as:

> " ' "To justify submitting lesser degrees of homicide than that charged in the information, there must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction on the lesser charge." ' "

---

[2] Williford was given a breathalyzer test at the time of booking which indicated that he tested .26% by weight of alcohol in his blood.

██ This rule, however, does not suggest that submission of lesser included offenses is automatic upon request:

"The key word in the rule is 'reasonable.' The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury. . . ." *State v. Bergenthal,* 47 Wis.2d 668, 675, 178 N.W.2d 16 (1971), *cert. den.* 402 U.S. 972.

██ Indeed, as noted in *Boyer v. State,* 91 Wis.2d 647, 668–69, 284 N.W.2d 30 (1979):

"[T]his court has on several occasion pointed out that it is error to instruct the jury as to lesser offenses when the evidence does not so warrant.

" 'The early cases point out and emphasize and we must stress again, because the question keeps recurring, that a determination of whether an instruction on a lesser included crime should be given to a jury is not solved by merely determining the crime charged includes the lesser offense because juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of. *Weisenbach v. State* (1909, 138 Wis. 152, 119 N.W. 843). The evidence must throw doubt upon the greater offense. Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. They are bound by the evidence and should be limited to those included crime which a reasonable view of the evidence will sustain and does not convince beyond a reasonable doubt the additional element of the greater crime existed.

" 'We are urged by Melvin to change this rule so that all included crimes or at least those requested by counsel would be charged even though the evidence may not raise a reasonable doubt of the sufficiency of the proof of the

greater crime. We decline to do so. The present rule is just both to the accused and the state.' *State v. Melvin,* 49 Wis.2d 246, 253, 181 N.W.2d 490 (1970).

"This court has consistently held that in order to justify submitting an instruction on third-degree murder the evidence must reveal a reasonable doubt as to both first and second-degree murder."

In *Ross, supra* at 172–73, this court made the following comment on the standard we apply for submitting lesser included offenses to the jury:

"Under these tests, the evidence is to be viewed in the most favorable light it will 'reasonably admit of from the standpoint of the accused.' This test does not call for a weighing of the evidence by the trial judge. He is merely obliged to examine the evidence to determine whether the proposed instruction is based upon mere conjecture and whether, if a verdict were returned on the lesser included offense, he would be obliged to set it aside. To instruct on the lesser included offense, speaking only to the evidentiary factors revealed at trial and not to the question of included elements, the evidence of the lesser included offense must be relevant and appreciable; and as considered most favorably to the defendant, the inclusion of the instruction must not be unreasonable. The question basically is whether a jury giving the evidence full credence could reasonably return a verdict of guilt on the lesser included offense."

It is, therefore, apparent that the issue of whether or not to instruct the jury on a lesser included offense is one of law. "If . . . the trial court fails to submit instructions on the lesser included offense when as a matter of law it should, its failure to do so constitutes prejudice to the defendant." *Boyer v. State,* 91 Wis.2d 647, 669, 284 N.W.2d 30 (1979).

The crime of manslaughter (heat of passion) is proscribed by sec. 940.05(1), Stats., which reads:

"Manslaughter. Whoever causes the death of another human being under any of the following circumstances is guilty of a Class C felony:

"(1) Without intent to kill and while in the heat of passion;"

■

The heat of passion element of this offense must be the result of adequate provocation and the defendant's state of mind at the time of the commission of the homicide; thus, heat of passion has both an objective (provocation) and a subjective (state of mind) facet. This court, in the seminal case of *Johnson v. State,* 129 Wis. 146, 160, 108 N.W. 55 (1906), defined the requisites of the objective facet of the the type and degree of the "heat of passion" necessary to reduce what would otherwise be murder to manslaughter:

"[T]he heat of passion which will reduce what would otherwise be murder to manslaughter . . . is such mental disturbance, caused by a reasonable, adequate provocation as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason: make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree, and to cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition. . . .".

Quoting 21 Am. & Eng. Ency. of Law (2d ed.), 177, we approved the following explication of the concept of "reasonable adequate provocation:"

" 'The provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror.' " *Johnson, supra* at 159.

This court has consistently adhered to and applied the *Johnson, supra,* formulation of the objective facet of heat of passion, and the most recent example of such is *Muller v. State,* 94 Wis.2d 450, 460, 289 N.W.2d 570 (1980). Further, we have continued to reject the invitation to abandon the foregoing objective test as to the reasonableness of the provocation in favor of a wholly subjective test that considers the facts as they apply to the individual defendant. *See, e.g., Hayzes v. State,* 64 Wis.2d 189, 197, 218 N.W.2d 717 (1974) ; *Weston v. State,* 28 Wis.2d 136, 143–44, 135 N.W.2d 820 (1965).

The subjective facet of the crime of manslaughter (heat of passion) requires that the provocation be sufficient to cause such mental disturbance in the particular defendant that so overcame and dominated or suspended his ability to exercise his judgment and rendered his mind temporarily deaf to the voice of reason, making him incapable of forming and executing that distinct intent to take human life so essential to murder in the first degree, and causing him "uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or reckless disposition," *Johnson, supra,* and that the provocation actually did produce such a mental disturbance (heat of passion) in the defendant at the time of the homicide. *See, e.g., State v. Marks,* 63 Wis.2d 769, 777, 218 N.W. 2d 328 (1974) ; *State v. Bond,* 41 Wis.2d 219, 229, 163 N.W.2d 601 (1969) ; *Hoyt v. State,* on rehearing 21 Wis. 2d 284, 291, 124 N.W.2d 47, 128 N.W.2d 645 (1964). *See also:* Wis JI—Criminal sec. 1130.

Addressing the objective facet of heat of passion we recount the facts below " 'in the most favorable light [they] will reasonably admit from the standpoint of the accused.' " *Ross, supra* at 172. The relationship between

Lennon and Annabelle was a continuous pattern of tumultuous conduct with both parties resorting to physical and verbal abuse of each other. Two and one-half to four years prior to the shooting, Annabelle became so inflamed with Williford that she resorted to drawing a gun on him on two occasions and in fact discharged it into a wall during one incident. Near the end of September in 1978, Lennon was served with separation papers designating his alcoholism and failure to support his family properly as the reason for the requested separation. Shortly thereafter, he agreed to turn his weekly payroll check over to Annabelle in an attempt at reconciliation and later became extremely displeased with this arrangement when Annabelle would take his check and disappear for the weekend. Then, on October 22, 1978, over a month before the shooting, Williford discovered that his wife had a paramour. He accepted the news calmly according to a police officer and promptly moved out of their home at 5407 Byrd avenue. Annabelle subsequently brought her "boyfriend" with her to two hearings with a Racine county family court commissioner, which action caused Williford to become "very" upset. This occurred in the latter part of October, more than three weeks before his wife's murder. The hearings resulted in the issuance of a temporary order, dated October 26, 1978, requiring Lennon to pay a total of $100 per week in support of his estranged family and *inter alia* granting Annabelle temporary custody of the children and the apartment at 5407 Byrd avenue. On November 4, 1978, three weeks before the shooting, Annabelle allegedly insulted Lennon while he was in the process of receiving a speeding ticket and Lennon reacted violently by chasing, grabbing, pushing and kicking her until the police intervened. Following this episode, Lennon phoned Annabelle and while arguing about the incident, threatened to kill her. Ap-

proximately a week later, on November 11, 1978, Williford, when responding to Annabelle's request for aid in starting her car, found a man, other than the boyfriend he had seen her with previously, sitting in her living room and became "embarrassed" at this encounter. Sometime during September or October, before Williford moved out of the apartment at 5407 Byrd avenue, he and Annabelle had a fight in which she beat him with a stick and he reciprocated by striking her. At the time of the murder, Annabelle repeated her prior objection to an attempt at reconciliation and referred to him as an old, stupid "son-of-a-bitch" and claimed she was going to marry her younger boyfriend in the near future. Annabelle then allegedly drew a gun on him and threatened to blow his brains out as he was getting up to leave. Although Williford ran toward her, Annabelle did not discharge the gun and a struggle ensued in which he succeeded in wresting the gun from her. Williford then shot Annabelle at least four times and continued to pull the trigger at least twice after he had emptied the gun of live rounds. After the killing, he stated he could not recall the actual shooting or the events, if any, that may have occurred after he had succeeded in taking the gun from Annabelle and prior to the shooting.

None of the arguable provocative events that ranged from four years to two weeks before the date of the murder, including Annabelle's previous gun slinging episodes, Williford's discovery that Annabelle had a paramour, her bringing him (the boyfriend) to the family court commissioner hearings, the speeding ticket and car starting incidents, etc., considered either alone or in combination with each other (meet the test of reasonable adequate provocation of an "ordinarily constituted person" as they were too remote or too far removed from the time

of the shooting, for even the most unreasonable of human beings would have cooled off and had time to reflect or deliberate on his course of action in the interim between those occurrences and the killing.

In *Muller v. State, supra,* a case similar to the case herein, the defendant was convicted of the crime of first-degree murder in the killing of his wife's boyfriend. The trial court refused to submit a verdict on manslaughter (heat of passion) and this court affirmed. Muller learned that his wife was unfaithful more than three weeks before the killing, but did not gain knowledge of her paramour's identity until an hour before the fatal attack. Upon learning the identity of his wife's lover, Muller called his wife and confronted her with this information and, after a time, she admitted it. Muller told his wife that he wanted to talk about it and informed her that he was coming up to her apartment. She told him not to come and denied that her boyfriend was with her at that time. When Muller arrived at his wife's apartment, he found her boyfriend's car parked in front of the house. This court described the ensuing events and rejected the defendant's claim that knowledge of his wife's infidelity constituted reasonable provocation for the slaying as follows:

"He was furious, ran up the stairs, and kicked in the kitchen door. He went into the living room and saw both children sleeping, and went down the hallway to the bedroom. The defendant remembers the pistol being shot once, but testified that he could not remember anything after that. The evidence also showed that three bullets entered the man's body.

"This is not evidence showing sudden resentment or such 'reasonable, adequate provocation' as would overcome or suspend the exercise of judgment of an ordinary man, since the defendant was aware one month prior to the crime that a man had stayed overnight at his wife's apartment. (Citations omitted.)" *Id.* at 462.

We find that the facts in this case are similar to those in *Muller* in that Williford learned of his wife's infidelity over a month before the shooting and was reminded of the same several times during the month of November as well as shortly before he murdered Annabelle when she informed him she was going to marry her "young man" soon. *See also: Zenou v. State,* 4 Wis.2d 655, 667, 91 N.W.2d 208 (1958) (the fact that the defendant had knowledge that his wife had been unfaithful for over three weeks, when considered with other provocative events leading up to the date of the murder, was too remote to constitute adequate provocation for killing her).

Moreover, we note that the evidence in this case demonstrates that Williford had in fact "cooled off" and was no longer affected by the couple's prior quarrels on the date of the killing, for he was willing to forgive his wife for her previous actions and sought a reconciliation with her on two previous occasions, including an offer immediately prior to her demise.

As for the victim's actions on the night of the killing, Williford testified that Annabelle rejected him, "cursed him out," and drew a pistol on him shortly before he shot her. In view of the couple's history of similar emotionally charged episodes, the altercation which Williford testified to before he relieved Annabelle of the gun was no more than an ordinary dispute between them. Further, we note that Annabelle did not have any intention of killing him as she had ample opportunity to fire the gun, if she so desired, not only as he ran toward her, but during the time period he wrested the gun from her. Thus, it is evident in this case that Williford knew he was never in any real danger of Annabelle when she drew the gun on November 25, 1978. In fact, it is obvious he was in no danger at the time he turned the gun on his

wife and fired it at least four times until all the live rounds were discharged into her body. He testified that he could not remember anything that happened from the time he disarmed her up until the time his shooting spree ended. This type of selective amnesia is commonplace in many homicides, but it should be pointed out that Williford was not suffering the highest degree of exasperation, rage, anger, terror or sudden resentment, for he had no difficulty remembering, recalling and testifying to all of the facts and specific details occurring immediately before and after the actual shooting, namely, that: (1) Annabelle insulted him, "you stupid old son-of-a-bitch," drew a gun and threatened to shoot him, "I am going to blow your brains out;" (2) she told him to remove his "damn ass" as they struggled for control of the gun; (3) he replied he "was not leaving while she had the gun;" (4) he gained control of the pistol; (5) he walked out the door with the gun in his hand; (6) Wanda hit him on the back and asked him "why did you do it;" (7) he looked at his stepdaughter, Dana Fraline, and heard her scream; and (8) he left the house, realized he shot his wife, decided to go to the police station, "got in my car and drove straight to the police station," and all events thereafter. Following the shooting, Williford told the police he "didn't mean to do it," but, the evidence belies that statement as it establishes that at some point after he wrested the gun from his wife, he became so intent on killing her that he in fact shot Annabelle, not once, not twice, not three times, but at least four times until all the live shells in the cylinder were discharged into her body. Immediately after the shooting, Williford well knew that he had killed his wife as his daughters described the look in his eyes and his facial expression as sad, solemn and dejected and refuted the alleged state of shock. The totality of the evidence is not

such as would give rise to a reasonable ground for acquittal of first-degree murder and conviction of a lesser included crime of manslaughter (heat of passion) as is evidenced by the jury's verdict in this case. Further, the evidence of Annabelle's actions shortly before Williford fired the fatal shots is not such as would naturally and instantly produce the highest degree of exasperation, rage, anger, terror or sudden resentment in the mind of an ordinary person for any such feelings that an ordinary person might experience upon having his spouse draw a gun on him would clearly dissipate when he succeeded in disarming her. The alleged resentment, anger or exasperation that followed the rejection of Williford's offer of reconciliation accompanied by a few verbal unpleasantries, when considered with the past history of continuous marital conflict and mutual physical and verbal abuse, must be held to constitute a lesser degree of provocation than that necessary to require submission of a verdict of manslaughter (heat of passion).

As a final argument, the defendant cites this court's decision in *Hoyt, supra,* and asserts that any provocation that occurred immediately before the shooting in this case must be held to have been greatly magnified as a result of Annabelle's treatment of Lennon over the course of their relationship, and that consequently the provocation was legally sufficient. The court of appeals agreed with this claim finding that the facts of this case parallel those in *Hoyt.*

In *Hoyt,* the deceased, Mr. Hoyt, frequently beat or choked his wife, the defendant, and further, had publicly insulted and humiliated her on numerous occasions. This abuse was one-sided as Mrs. Hoyt at no time ever insulted, assaulted or publicly humiliated her husband. On the afternoon of the killing, Mr. Hoyt repeated his verbal pattern of continual conduct of physical assault and pri-

vate and public humiliation and insult of his wife. When they returned home, Mrs. Hoyt attempted to talk to her husband, but he told her to "go to hell" and committed three physical assaults upon her: first, pushing her off the davenport; second, pushing her head toward the floor; and then, finally, putting his hand on her face and pushing her with such force that she fell to the ground, while repeating his pattern of insult and humiliation. She testified that without thinking, she walked to their bedroom, drew his gun while in fear of further violent physical abuse and pointed it at him. He continued to insult her and dared and taunted her to shoot, saying, " 'Have you got a knife—cut me. You got my gun?' . . . 'Shoot it's not loaded—shoot.' . . . 'Come on, Bitch' . . . 'Come on . . . shoot,' . . . 'shoot, I don't care about you, I don't care about kids, I don't care about anything, shoot, shoot, shoot, shoot, shoot!' " *Id.* at 289. She further testified, "His face came at me—it was all red and contorted." *Ibid.* She fired the gun and killed him. After the shooting, she appeared to be in a state of shock, had difficulty explaining what had happened and wanted to give up her child to her parents and finally spoke of taking her own life. It is obvious that Mrs. Hoyt experienced the type of mental disturbance which this court defined as "heat of passion" in *Johnson, supra. See also: Muller, supra; Hayzes v. State,* 64 Wis.2d 189, 196, 218 N.W.2d 163 (1974). The state conceded that Mrs. Hoyt did not form a specific intent to kill as she was charged with second rather than first-degree murder. Mr. Hoyt's request for submission of manslaughter (heat of passion) was refused. We reversed the trial court's rejection of this request, stating:

"If we look solely at the action of Mr. Hoyt in the last few minutes before the shooting, it seems clear that such actions would not be sufficient to produce the required

degree of disturbance in an ordinarily constituted person not previously subjected to the treatment visited upon Mrs. Hoyt by her husband and disclosed by the record. On the other hand, it seems reasonable that the treatment to which Mrs. Hoyt had been subjected for a long period of time, and the public humiliation of her within the previous hour would have a cumulative effect upon any ordinary person so that the provocation just before the shooting would be greatly magnified.

"Under the peculiar circumstances of this case, we conclude that a jury might properly have found her guilty of heat-of-passion manslaughter and entertained a reasonable doubt of her guilt of second-degree murder, and that the manslaughter verdict should have been submitted." *Id.* at 291–92.

The facts of *Hoyt* demonstrate that it is readily distinguishable from this case as the facts therein do not delineate any occurrence in the history of the relation of the parties as well as immediately prior to the shooting where Mrs. Hoyt ever verbally abused or physically assaulted her husband. On the contrary, the facts in *Hoyt* indicate that she, over a long period of time, had attempted to sublimate or repress her pent up frustrations with her husband's frequent insults and abuse and became something of a human time bomb that exploded on the proper ignition. In contrast, the mistreatment in this case was not one-sided, but rather, the record clearly demonstrates that Williford, the assailant, and Annabelle engaged in a continual course of mutual verbal insults and physical violence. The defendant did not repress his reaction to his spouse's abuse of him, as did Mrs. Hoyt, but, rather, became combative and retaliated with physical violence and insults directed at her from time to time. In fact, he vented his anger on more than one occasion, the last time on November 4, 1978, some three weeks before the shooting, when he forcefully attacked and kicked her until the police intervened.

Another crucial distinction between this case and *Hoyt* exists in the victims' actions immediately before and contemporaneous with the shooting. In *Hoyt,* Mr. Hoyt publicly humiliated his wife within an hour of the killing and forcefully assaulted, insulted and incessantly taunted and dared her to shoot up to and immediately before the fatal shot. There was no respite or cooling off period for Mrs. Hoyt in the hour, minutes or seconds preceding the shooting. In contrast, the record in this case is devoid of any evidence that Annabelle, within days or immediately prior to the shooting, publicly humiliated, taunted or dared Williford to shoot her. Further, Mrs. Hoyt·was described as being in a complete state of shock, staring with her eyes wide open and unable to explain the events of the shooting whereas Williford was characterized as being "very sad," "very calm," and "very nice," and able to relate the events before and after the murder. All of the testimony regarding the shooting in this case, and in particular Williford's threat to kill Annabelle about three weeks before the killing, stating, "Listen here, you're going to wind up—and I'm going to kill you," another fact not present in *Hoyt,* demonstrates another contrast to *Hoyt.* The only reasonable inference that can be drawn from the evidence if we are to believe Williford's statement that Annabelle owned the murder weapon rather than that he owned and possessed it as the state contends is that after he gained possession of the revolver from Annabelle, he intentionally and mechanically pumped at least four bullets into her, emptying the revolver. Thus, *Hoyt* is distinguishable and must be limited to the "peculiar circumstances" in that case of a continual pattern of reprehensible conduct of a husband physically assaulting and verbally insulting and humiliating his spouse.

Therefore, we hold that a thorough review of the record demonstrates that Annabelle's actions preceding the shooting were not of a character that could reasonably be said to produce, naturally and instantly, the highest degree of exasperation, rage, terror, anger or sudden resentment in the mind of an ordinary person and thus the trial court did not err in refusing to submit the lesser offense of manslaughter (heat of passion) as the record does not support the degree of provocation and heat of passion required for submitting that charge. Further, we note that the jury, after due consideration, rejected the lesser but more serious charge of second-degree murder and convicted of the greater offense of first-degree murder. Thus, in view of the jury's rejection of the second-degree murder charge, it seems rather obvious that submission of manslaughter (heat of passion) in this case would have been an invitation to the jury to pick and choose a compromise verdict:

" '[J]uries are not to be given the discretion or freedom to pick and choose what offenses the accused should be found guilty of. [citation]. The evidence must throw doubt upon the greater offense. Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement.' " *Boyer, supra* at 668.

In appealing to the court of appeals, the defendant raised a number of issues that had been properly preserved for appeal. The decision of the appellate court was such that it was not required to reach all of the issues on appeal. After a thorough review of the record as to the unresolved issues involving alleged newly discovered evidence, ineffective assistance of counsel, admission of evidence of post-arrest invocation of *Miranda* rights, and that reversal is required in the interest of justice, we find that such claims are without merit and therefore we re-

verse the decision of the court of appeals and affirm the judgment of conviction and order denying post-conviction relief.

*By the Court.*—The decision of the court of appeals is reversed and the judgment of conviction and order denying post-conviction relief is affirmed.