Eric Jameson LaSALLE, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–97–084 CR.

Court of Appeals of Texas,
Beaumont.

Submitted June 4, 1998.

Decided Aug. 26, 1998.

Peter F. Doyle, Jr., Nederland, for appellant.

Tom Maness, Criminal District Attorney, Rodney D. Conerly, Assistant Criminal District Attorney, Beaumont, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

A jury convicted LaSalle for having committed the felony offense of Injury to a Child.

The jury subsequently assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of twenty (20) years. Appellant was also assessed a fine of $10,000. Twelve points of error are raised for our consideration. Eight of said points of error complain of the trial court's failure to grant LaSalle's motions for instructed verdict at both the conclusion of the State's presentation of evidence and at the conclusion of the guilt/innocence phase of the trial for a variety of specific reasons. These eight points of error are further divided into questions of legal sufficiency and factual sufficiency of certain elements of the offense charged. Point of error twelve provides a general complaint of factual insufficiency of the evidence to support the conviction as alleged in the indictment. We will address the sufficiency points first.

In reviewing a record for legal sufficiency, we view the evidence in the light most favorable to the verdict, and ask whether any rational trier of fact could have found beyond a reasonable doubt all of the elements of the offense. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Santellan v. State,* 939 S.W.2d 155, 160 (Tex.Crim. App.1997). With regard to a factual sufficiency analysis, the proper standard for appellate review was articulated in *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim.App.1996), as follows:

> The court of appeals 'views all the evidence without the prism of 'in the light most favorable to the prosecution.' . . . [and] set[s] aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.'

*Id.* at 129 (quoting *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd)). In considering a factual sufficiency point on appeal, we must consider all of the evidence in the record related to an appellant's factual sufficiency challenge, not just the evidence which supports the verdict. *Santellan,* 939 S.W.2d at 164. We then review the evidence weighed by the jury which tends to prove the existence of the elemental fact in dispute, and compare it to the evidence which tends

to disprove that fact. *Id.* Although we are authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict, our review must nevertheless be appropriately deferential so as to avoid the substitution of our judgment for that of the fact finder. *Id.* This deference to the jury's findings is maintained by finding fault only when the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust. *Id.* at 164–65; *Clewis,* 922 S.W.2d at 135. A "clearly wrong and unjust" verdict would be one in which "the jury's finding is 'manifestly unjust,' 'shocks the conscience,' or 'clearly demonstrates bias.'" *Santellan,* 939 S.W.2d at 165. As was explained in *Clewis:*

> Appellate courts should only exercise their fact jurisdiction to prevent a manifestly unjust result; . . . those courts 'are not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable.'

*Clewis,* 922 S.W.2d at 135 (quoting *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex. 1986)).

The testimony indicated that the two-year old victim, D.D.B., was the son of LaSalle's former girlfriend. On the day in question, August 15, 1996, D.D.B.'s mother let LaSalle take D.D.B. with him to run some errands. LaSalle and D.D.B. left in LaSalle's car at approximately 6:00 p.m. D.D.B.'s mother expected LaSalle and her son back in about an hour. At about 10:00 p.m. or 10:30 p.m. that evening, LaSalle called D.D.B.'s mother and told her D.D.B. was in the hospital. She rushed to the hospital and found D.D.B. unconscious. The doctors were unsure if D.D.B. would survive. D.D.B. drifted in and out of consciousness and eventually was taken into surgery to repair head and facial lacerations. D.D.B.'s mother was asked if he suffered "any serious permanent disfigurement," and she answered, "Yes." A photograph, State's Exhibit No. 3, was shown to the jury depicting D.D.B.'s permanent facial scarring and disfigurement.

Officer David Todd Burke of the Beaumont Police Department testified that at about 9:23 p.m. on the evening in question,

he observed appellant's vehicle traveling at a high rate of speed. Officer Burke also described the vehicle as "weaving in and out of traffic." Officer Burke moved behind the vehicle and noted it was traveling 50 miles per hour on a street with a 35–miles–per–hour speed limit. Officer Burke engaged his emergency lights and the vehicle stopped. As Burke approached the vehicle, he noticed the driver was "slouched down real low underneath the steering wheel." Suddenly, the driver pulled his vehicle away at a high rate of speed. Officer Burke returned to his patrol unit and began pursuing the vehicle. Officer Burke testified the vehicle ran through at least two stop signs during the ensuing chase. At no time did the driver make any effort to stop or slow down to ensure no cross-traffic was approaching. At the intersection of Hazel and Martin Luther King Boulevard, the vehicle ran through another stop sign, again without attempting to stop or slow down. At this point, Officer Burke observed another vehicle traveling on M.L.K. Blvd. strike LaSalle's vehicle. Officer Burke stated LaSalle was clearly at fault in causing the accident as he ran the posted stop sign at the intersection. Officer Burke further testified the collision caused LaSalle's vehicle to become airborne, completely roll in mid air, strike a telephone pole, severing it in half, and finally come to rest upside down in a residential yard.

Because the vehicle which struck LaSalle's vehicle was disabled in the roadway, Officer Burke positioned his unit so that the injured occupants would not be in danger of oncoming traffic. When he finally made it to LaSalle's vehicle, LaSalle had managed to extricate himself from the vehicle and leave the scene. Officer Burke did not see this occur and initially did not know the identity of the driver. Because LaSalle's vehicle was lying upside down and its top crushed, Burke was unsure if anyone else was in the vehicle. As he continued to examine the vehicle, Burke observed D.D.B. pinned inside the vehicle and apparently unconscious. Burke believed the child was dead.

Following testimony from the driver of the other vehicle involved in the collision indicating that he too observed LaSalle's vehicle being operated at a high rate of speed, another eyewitness, Tommy Welch, was called to the stand. Welch testified he was a former emergency medical technician for the City of Beaumont and on the evening in question, he observed LaSalle's vehicle run a stop sign in front of his [Welch's] motorcycle. Welch had to brake sharply to avoid being struck by LaSalle. Welch also observed Officer Burke pursuing LaSalle. Welch then went on to describe the subsequent collision as he observed it. Following the collision, Welch approached the scene to try to assist Officer Burke with the injured parties. When he approached LaSalle's vehicle, Welch observed D.D.B. trapped underneath the steering wheel on the driver's side of the vehicle. Welch observed D.D.B. to be unconscious. Welch could not see the child breathing, but the child did have a pulse. Welch thought the child was dying. Welch managed to position his body just inside the vehicle so as to be able to grab the steering wheel and lift it off of the child's body. The following direct examination testimony of Welch describing the situation is quite compelling:

A.[Welch] . . . And I guess the position I was in, I didn't have a whole lot of leverage, but I got the steering wheel off the baby about two inches and the baby gasped for breath and started breathing on his own.

Q.[State] Did it regain consciousness?

A. No, sir, it didn't.

Q. Could you let go of the steering wheel at that point?

A. No, sir, I couldn't.

Q. Why not?

A. I let go for a couple of second [sic] to change my position and immediately when the steering wheel went back on the baby's chest, it quit breathing.

Q. So, he was trapped in a life-threatening situation?

A. Yes, sir. And I couldn't move him and hold the steering wheel, too.

Q. I guess it's a good thing you got there pretty quickly?

A. Right.

Q. Were you able to get the baby out?

A. No, sir, I couldn't.

Q. What was used to get the baby out or how was that done?

A. Well, I had the steering wheel off the baby until the fire fighters got there, the rescue squad.

Q. And they were finally able to get the child out?

A. Yes, sir. They had enough manpower there that they could do it.

Q. During that whole time, could you tell whether or not the child had ever regained consciousness?

A. No, sir, he didn't.

Q. Did he appear, other than the fact that he was unconscious and trapped, did you see any injuries?

A. Yes, sir. His face was cut pretty bad.

Following presentation of the State's case, LaSalle moved for an instructed verdict, which the trial court denied. LaSalle called a family friend, Norma Jean Brown, as a witness. The gist of Ms. Brown's testimony was that LaSalle showed up at her house on the evening in question with lacerations to his head and legs, and to the fact that LaSalle was very disoriented to the point that "he came in and out of consciousness, sleep-like state but he could not speak to me." LaSalle then took the stand and testified in his behalf. He admitted that he was driving the vehicle in which D.D.B. was a passenger. LaSalle, however, denied operating the vehicle at an excessive rate of speed and denied fleeing from Officer Burke. His explanation for failing to stop at the intersection of M.L.K. and Hazel, which led to the collision, was provided in the following narrative response during direct examination by his trial counsel:

Q.[Trial counsel] All right. Explain to the jury why is it you feel you didn't do what the State has accused you of?

A.[LaSalle] Well, on the day in question, I was coming up Magnolia Street. As I came up Magnolia Street, I made a right on Hazel Street. I come on down Hazel Street. As I got about a block from Hazel and M.L.K., I noticed a bright light in my rear view mirror. When I looked in my rear view mirror, I noticed a siren. And

at the time I said, "Well, it's the police." By that time, I was approaching the intersection of M.L.K. and Hazel.

When the bright lights hit my rear view mirror, I looked in my mirror and noticed the bright lights. I was approaching the intersection. I wasn't able to focus my eyes correctly or back on the intersection of Hazel and M.L.K. and the stop sign.

By the time I approached the stop sign, I had to make a decision; I either had to slam on my breaks [sic] and slide off into the highway and get hit or accelerate to try to avoid the accident. So, I accelerated and went across the highway and got struck by an oncoming car.

At that time I got struck, I tried to maneuver my car in a manner in which I could get around hitting that telephone pole that was on the side of the highway there in which my car started flipping.

At that time, my head made contact with my front windshield and I was knocked unconscious. That's the last thing that I remember during the course of that incident up until the time I remember walking up the highway and being picked up by an individual.

Q. When that individual picked you up, what happened next?

A. Well, he—the individual knew me because he took me to the witness that just testified house and that was it. I went in the house and laid down on the couch and sat there.

Q. For a couple of days?

A. Well, yeah, I stayed there for a couple of days.

After LaSalle testified, he again moved for an instructed verdict which was denied by the trial court.

### SERIOUS BODILY INJURY

■  Initially, as a point of clarification, we note that any complaint on appeal regarding the overruling of a motion for directed/instructed verdict by the trial court is in actuality an attack upon the legal sufficiency of the evidence to sustain the conviction. *McDuff v. State,* 939 S.W.2d 607, 613 (Tex. Crim.App.), *cert. denied,* —— U.S. ——, 118

S.Ct. 125, 139 L.Ed.2d 75 (1997) (citing *Cook v. State*, 858 S.W.2d 467, 469–70 (Tex.Crim. App.1993)). With regard to the element of serious bodily injury, Tex. Pen.Code Ann. § 1.07(46) (Vernon 1994), defines the term as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." The term "bodily injury" is defined in § 1.07(8) as "physical pain, illness, or any impairment of physical condition." It is undisputed that at the scene of the collision, D.D.B. was unconscious, was not breathing, and had severe cuts about his face and head. In his brief, LaSalle argues that the State failed to prove D.D.B. sustained "serious bodily injury" as defined in § 1.07(46) and supports this position with the following interpretation of authority:

> That section of the Texas Penal Code has been discussed numerous times. In *Black v. State*, 637 S.W.2d 923, (Tex.Crim. App., 1982) the State did not offer any hospital records, a physician who treated the child, or a nurse who administered the wounds. The victim in that case, who had been shot during a robbery, had no trouble walking around after he healed up; and did not testify or indicate that he suffered from any protracted loss or impairment of a bodily member. The victim spent three (3) days in the hospital.

We find the facts in *Black* to be significantly distinguishable from the facts in the instant case. In *Black*, the victim was an adult male who testified that he was shot in the thigh by Black during a robbery. *Id.* at 924. The evidence indicated that after being shot, the victim ran one and one-half to two miles before finally gaining assistance. *Id.* at 926. During that period of time, the victim did not lose consciousness, nor was there any evidence that the gunshot wound presented him with a substantial risk of death. Although the victim did testify his leg took two to three months to heal following surgery to remove the bullet, he did not indicate that he had suffered any loss of the use of the leg, nor suffered any permanent damage to the limb. *Id.*

As to the proper legal focus on this issue, we find the explanation provided in *Barrera v. State*, 820 S.W.2d 194, 196 (Tex.App.—Corpus Christi 1991, pet. ref'd), to be quite sound. In *Barrera*, the testimony of the victim's attending physician indicated that although the victim initially presented a substantial risk of death from the stab wound, after the operation the victim was no longer in substantial risk of death. On appeal, Barrera argued that since the last portion of the doctor's testimony indicated the victim was not in jeopardy of dying following the surgery, the evidence was insufficient to prove "serious bodily injury." In discussing why the evidence was indeed sufficient, the Court placed the inquiry in the following context:

> Dr. Schorlemmer's testimony that the wound created a substantial risk of death is sufficient to establish that [the victim] suffered serious bodily injury. *See Boney v. State*, 572 S.W.2d 529, 532 (Tex.Crim. App.1978). The relevant inquiry is the extent of the bodily injury as inflicted, not after the effects have been ameliorated or exacerbated by medical treatment. *Brown v. State*, 605 S.W.2d 572, 575 (Tex.Crim. App.1980). Dr. Schorlemmer's testimony that post-operatively [the victim] was not at risk of death does not render the evidence insufficient.

In the instant case, Officer Burke testified that when he encountered D.D.B., he thought the child was dead. Furthermore, former emergency medical technician Tommy Welch was questioned as to his observations as follows:

Q.[State] Was it obvious to you that the baby was unconscious?

A.[Welch] Yes, sir.

Q. Was it obvious to you that the baby was seriously injured?

A. Yes, sir.

Q. Was it obvious to you that the baby couldn't breath?

A. Yes, sir.

Q. Was it obvious to you that if somebody didn't help this baby right away that this baby could die?

A. I guarantee you.

This testimony was completely uncontroverted by LaSalle. Coupled with the testimony from D.D.B.'s mother that the facial scars would permanently disfigure the child, we find that the evidence was both legally and factually sufficient to prove D.D.B. sustained serious bodily injury. Points of error four and eight are overruled.

### "INTENDED TO INJURE THE CHILD"

■ Points of error five and nine contend that the evidence was legally and factually insufficient to show that LaSalle "intended to injure the child." The elements of the offense of Injury to a Child as set out in Tex. Pen.Code Ann. § 22.04(a) (Vernon 1994) provide, in pertinent part, that a person commits an offense if he recklessly causes a child, fourteen years of age or younger, serious bodily injury. Under either a *Jackson v. Virginia* legal sufficiency review or a *Santellan/Clewis* factual sufficiency review, the scope is limited to an examination of the record for proof of the *essential* elements of the offense for which the accused was convicted. *See Skinner v. State*, 956 S.W.2d 532, 536 (Tex.Crim.App.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998); *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996), *cert. denied*, — U.S. —, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). As "intended to injure the child" is not an essential element of the offense of Injury to a Child, we need not conduct a legal or factual sufficiency review for its existence in the record. Points of error five and nine are overruled.

### "RECKLESS" CULPABLE MENTAL STATE

■ In presenting us with his legal and factual sufficiency points regarding the State's proof of his culpable mental state, LaSalle further compartmentalizes these points of error by attempting to distinguish the state of the evidence at the conclusion of the State's case-in-chief with the state of the evidence at the conclusion of the guilt/innocence phase of the trial. However, in both a legal sufficiency and factual sufficiency review, we view *all* of the evidence presented to the fact finder. *See McDuff,* 939 S.W.2d at 614; *Santellan,* 939 S.W.2d at 164. Therefore, points of error three and seven will be addressed together as to legal sufficiency of the record evidence to support the conviction while points of error two and six will be addressed together in our factual sufficiency analysis.

■ As with any essential element of an offense, the State has the burden to prove an accused's culpable mental state beyond a reasonable doubt. *See Thomas v. State,* 886 S.W.2d 388, 391 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). Tex. Pen.Code Ann. § 6.03(c) (Vernon 1994) provides that a person

> acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Thus, the culpable mental state of "reckless" is satisfied by evidence indicating that the accused "consciously disregarded a known substantial and unjustifiable risk that serious bodily injury would occur; a risk that if disregarded constitutes a gross deviation from the standard of care an ordinary person would exercise under the same circumstances." *Johnson v. State,* 915 S.W.2d 653, 658 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd); (citing *Hayes v. State,* 728 S.W.2d 804, 809 (Tex.Crim.App.1987)(opinion on reh'g)).

This Court has repeatedly held that intent may be inferred from circumstantial evidence, including evidence of the accused's acts, words, and conduct. *See McWhorter v. State,* 957 S.W.2d 928, 930 (Tex.App.—Beaumont 1997, no pet.); *Schexnider v. State,* 943 S.W.2d 194, 200 (Tex.App.—Beaumont 1997, no pet.); *Brunt v. State,* 928 S.W.2d 313, 315 (Tex.App.—Beaumont 1996, pet. ref'd). *See also Wolfe v. State,* 917 S.W.2d 270, 275 (Tex.Crim.App.1996). In the instant case, taking all of the evidence in the light most

favorable to the verdict, any rational trier of fact could have found LaSalle to have been aware of, but have consciously disregarded, the substantial risk that operating his vehicle at a speed of 50 miles per hour in an area of the city where the speed limit was 35 miles per hour *while at the same time* completely disregarding stop signs at a number of intersections would result in at least serious bodily injury to anyone in his vehicle, including D.D.B. As for the factual sufficiency of the reckless mental state, after unplugging the "light most favorable to the verdict," we cannot say that even considering LaSalle's testimony and any other evidence in his favor, the jury's verdict was against the *great* weight of the incriminating evidence presented at trial so as to be clearly wrong and unjust. As noted above, in considering the jury's verdict *vis a vis* all of the evidence, said verdict is not "manifestly unjust," nor does it "shock the conscious" or "clearly demonstrate bias." The jury was free to reject LaSalle's rendition of the events. *See Santellan,* 939 S.W.2d at 164. Points of error two, three, six, and seven are overruled.

LaSalle's point of error twelve, which is a general factual sufficiency complaint, directs our attention to the case of *Whitmire v. State,* 913 S.W.2d 738 (Tex.App.—Eastland 1996), *abated,* 943 S.W.2d 894 (Tex.Crim.App. 1997), because the Eastland Court found the evidence to be insufficient to establish that the defendant recklessly injured the child in question. *Whitmire* is entirely distinguishable from the facts proven in the instant case because in *Whitmire* the child-victim was a passenger in another vehicle, *not* in the defendant's vehicle. Whitmire argued, and the Eastland Court agreed, that he had not been aware that there was a child in the oncoming vehicle when he (Whitmire) collided with it, notwithstanding Whitmire's blood alcohol concentration of between .205 and .207 at the time of the collision. Interestingly, the Court of Criminal Appeals initially granted the State's petition for discretionary review in order to examine the viability of the Eastland Court's holding. However, during the pendency of the review process, Whitmire died resulting in the permanent abatement of the appeal. *See Whitmire v. State,* 943 S.W.2d 894 (Tex.Crim.App.1997). Again,

having reviewed all of the evidence, we simply cannot say that the jury's verdict was against the *great* weight of the incriminating evidence so as to be clearly wrong and unjust. Point of error twelve is overruled.

■ Point of error one complains of the trial court's denial of LaSalle's timely motion to quash the indictment. In pertinent part, the indictment alleged that LaSalle "did then and there recklessly cause serious bodily injury ... by attempting to elude a police officer and failing to yield at a stop sign and causing a traffic accident that injured the Complainant." LaSalle complains the indictment was defective for failing to "set forth the manner and the means by which the Complainant was injured." LaSalle also finds fault with the indictment for failing to allege "the manner and means by which 'causing a traffic accident' was an illegal act." LaSalle further argues the indictment fails to allege how he failed to yield "at a stop sign," and fails to allege the location where the failure to yield occurred. Finally, LaSalle argues that "attempting to evade a police officer" is to be likened to the offense of "Attempting to Elude," an offense found in the Transportation Code, and therefore requires the pleading of the specific elements in the indictment. *See* TEX. TRANSP. CODE ANN. § 545.421 (Vernon Pamph.1998).

■ Article I, § 10 of the Texas Constitution guarantees the accused the right to be informed of the "nature and cause of the accusation against him." TEX.CODE CRIM. PROC. ANN. art. 21.15 (Vernon 1989), provides that whenever the accused is charged with acting recklessly in the commission of an offense, the indictment must allege with reasonable certainty the act or acts constituting recklessness. The indictment is insufficient if it merely alleges that the accused acted recklessly in committing the offense. *Id.* A motion to quash must be granted if the language in the charging instrument concerning the accused's conduct is so vague or indefinite as to deny him effective notice of the behavior in which he allegedly engaged. *State v. Carter,* 810 S.W.2d 197, 199 (Tex. Crim.App.1991). In *Townsley v. State,* 538

S.W.2d 411 (Tex.Crim.App.1976), the indictment alleged that the defendant:

> did then and there recklessly cause the death of Luther Eugene Stark by driving a motor vehicle at an excessive rate of speed while attempting to elude a police officer and recklessly causing said vehicle to run off the roadway and roll over, thereby fatally injuring the said Luther Eugene Stark, who was a passenger in said vehicle....

The Court in *Townsley* held the above language alleged the reckless act with reasonable certainty. *Id.* at 412–13. Similarly worded indictments were upheld by the Court in *Crume v. State,* 658 S.W.2d 607, 609 (Tex.Crim.App.1983), and *Arredondo v. State,* 582 S.W.2d 457, 459 (Tex.Crim.App. 1979). LaSalle appears to argue that because the alleged acts of recklessness happened to also be similar to criminal offenses in and of themselves, the State was required to specifically plead their respective constituent elements. We do not read the cases to require such strict and narrow drafting of charging instruments. We hold the indictment in the instant case set out the reckless acts with reasonable certainty so as to permit LaSalle to adequately prepare his defense. Point of error one is overruled.

■ Points of error ten and eleven complain of the trial court's denial of LaSalle's request to include in the instructions to the jury two allegedly lesser included offenses. Specifically, LaSalle requested the jury instructions include definitions and verdict forms for the offenses of "Failure to Yield or Stop" and "Attempting to Elude." For a discussion on the law of lesser included offenses, LaSalle correctly refers us to *Arevalo v. State,* 943 S.W.2d 887 (Tex.Crim.App. 1997). In *Arevalo,* the Court reaffirmed the "*Rousseau-Aguilar-Royster*"[1] line of cases as authority for determining under what circumstances a charge on a lesser included offense is required. As noted in *Arevalo,* the "test" consists of the following inquiry:

> [F]irst, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second,

some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense.

*Id.* at 889 (quoting *Rousseau,* 855 S.W.2d at 673) (emphasis omitted). The significance of *Arevalo* is that the Court provided a well-reasoned rationale for the second prong of the *Rousseau-Aguilar-Royster* test. We set out the Court's discussion, which we find dispositive of points ten and eleven, as follows:

> We have never stated a rationale for the second prong of the *Rousseau-Aguilar-Royster* test, perhaps because we thought the rationale was obvious. In any event, the rationale is clear to us today, and it involves the very nature of the jury's function at the guilt/innocence stage of a criminal trial. The jury's sole function at the guilt/innocence stage is to find the historical facts. The second prong of the test preserves the integrity of the jury as the factfinder by ensuring that the jury is instructed as to a lesser included offense only when that offense constitutes a valid, rational alternative to the charged offense. If a jury were instructed on a lesser included offense even though the evidence did not raise it, then the instruction "would constitute an invitation to the jury to return a compromise or otherwise unwarranted verdict." The Supreme Court of Wisconsin explained the rationale of the second prong this way:
>
> > ... [A] determination of whether an instruction on a lesser included crime should be given to a jury is not solved by merely determining the crime charged includes the lesser offense because juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of. The evidence must throw doubt upon the greater offense. Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. They are bound by the evidence and should be limited to those

1. *See Rousseau v. State,* 855 S.W.2d 666 (Tex. Crim.App.1993); *Aguilar v. State,* 682 S.W.2d 556 (Tex.Crim.App.1985); and *Royster v. State,* 622 S.W.2d 442 (Tex.Crim.App.1981).

included crimes which a reasonable view of the evidence will sustain. . . .

*State v. Williford,* 103 Wis.2d 98, 307 N.W.2d 277, 282 (1981) (citations omitted).

In our view, the rationale underlying the second prong of the *Rousseau-Aguilar-Royster* test is as applicable to the State's request for a lesser included offense instruction as it is to a defendant's request. Regardless of which litigant requests a lesser-included offense instruction, that instruction must not constitute an invitation to the jury to reach an irrational verdict. . . . Article 37.08 [2] does not authorize a jury to find a defendant guilty of an offense less than the one charged unless the evidence reasonably justifies the jury in doing so.

*Arevalo,* at 889–90.

In the instant case, the gravamen of the offense was that serious injuries were sustained by the child-victim because of the recklessness of LaSalle, not the specific facts which constituted the various acts of recklessness LaSalle engaged in. As we noted above, a person commits Injury to a Child if he recklessly causes a child, fourteen years of age or younger, serious bodily injury. The fact that D.D.B. was in very serious condition moments after the collision was not disputed at trial. The evidence in the instant case did not "throw doubt upon the greater offense." In other words, there is absolutely no evidence in the record before us that would indicate that the jury could rationally find that if LaSalle was guilty, he was guilty of only the allegedly lesser included offenses. Because we find the second prong of the *Rousseau-Aguilar-Royster* test was not met, we need not address its first prong. The trial court did not err in denying LaSalle's requested jury instructions. Points of error ten and eleven are overruled. The judgment and the sentence are affirmed.

AFFIRMED.

---

2. Tᴇx.Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. Aɴɴ. art. 37.08 (Vernon 1981), entitled, "Conviction of lesser included offense," provides: "In a prosecution for an of- fense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense."